**NATIONAL PORK PRODUCERS COUNCIL, an Iowa Corporation, Charles Grassley, Tom Hagedorn and Steven Symms, Plaintiffs,**

**National Independent Meat Packers Association, Plaintiff-Intervenor,**

**v.**

**Bob BERGLAND, Secretary of Agriculture, Carol Tucker Foreman, Assistant Secretary of Agriculture for Food and Consumer Services, and Donald Houston, Acting Administrator, Food Safety & Quality Service, Defendants.**

Civ. No. 79–431–C.

United States District Court,
S. D. Iowa, C. D.

Feb. 11, 1980.

Donald P. Colleton, Abramson & Fox, Chicago, Ill., Charles S. Crook, III, Beving, Swanson & Forrest, Des Moines, Iowa, for plaintiffs.

Edwin H. Pewett, Hershel Shanks, James B. Davis and James M. Kefauver, Washington, D. C., for plaintiff-intervenor.

Roxanne Barton Conlin, U. S. Atty., Des Moines, Iowa, Theodore C. Hirt, and Gregory Cooper, Attys., Dept. of Justice, Washington, D. C., for defendants.

## RULING AND ORDER

STUART, District Judge.

This is an action for judicial review of agency action pursuant to the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 et seq. Plaintiffs are three members of the United States House of Representatives and two trade associations representing pork producers and meat packers. Defendants are the Secretary of Agriculture, the Assistant Secretary of Agriculture for Food and Consumer Services, and the Acting Administrator of the Food Safety and Quality Service (FSQS) of the United States Department of Agriculture (USDA). Plaintiffs seek a declaratory judgment that a USDA regulation permitting meat products prepared without nitrates or nitrites to be marketed under traditional names, such as bacon, ham, corned beef, and frankfurters, is arbitrary, capricious, an abuse of discretion and not otherwise in accordance with law. They also request permanent injunctive relief preventing defendants from approving meat product labels under the challenged provision.

On April 28, 1978, the Administrator of FSQS proposed to amend the federal meat inspection regulations (See Federal Meat Inspection Act of 1907, 21 U.S.C. §§ 601 et seq.) to permit the preparation and sale of meat food products under those traditional names, even though such products, which have traditionally been cured with nitrates or nitrites, would be prepared without such preservatives. 43 Fed.Reg. 18193 (April 28, 1978). He further proposed that:

(1) A product not prepared with nitrates or nitrites should be labeled 'No Nitrate or Nitrite Added—Not Preserved, Must Be Refrigerated Below 40°F at All Times'; and

(2) The preparation and sale of a product prepared without nitrate or nitrite should be permitted only if the product is prepared with some added substance or substances and is found by the Administrator to have a similar flavor and consistency to the product prepared with nitrate or nitrite.

Id. at 18194–95. Individual consumers, consumer organizations, trade associations and others submitted 365 comments to FSQS regarding the proposed amendments. FSQS reviewed the comments and on July 18, 1979, consulted the National Advisory Committee on Meat and Poultry Inspection (the Advisory Committee) with regard to the proposals and the comments thereon. On August 21, 1979, the Acting Administrator of FSQS (who is hereinafter referred to as the "Administrator"), promulgated a regulation permitting, inter alia, meat products prepared without nitrates or nitrites to be marketed under the traditional names of products prepared with nitrates or nitrites if:

(1) The traditional name on the label of the product prepared without nitrates

or nitrites is preceded by the word 'Uncured' in the same size and style of lettering as the traditional name;

(2) The label carries the following information adjacent to the product name in lettering of easily readable style and at least one-half the size of the product name:

(a) 'No Nitrate or Nitrite Added'; and

(b) 'Not Preserved—Keep Refrigerated Below 40°F. At All Times';

(3) The product is found by the Administrator to be similar in size, flavor, consistency and general appearance to the product commonly prepared with nitrate or nitrite.

44 Fed.Reg. 48959–961 (August 21, 1979).

On September 20, 1979, the National Pork Producers Council and Congressmen Grassley, Hagedorn and Symms filed this action. The National Independent Meat Packers Association was subsequently permitted to intervene as a party plaintiff. On November 9, 1979, plaintiffs' motion for a preliminary injunction came on for hearing before the Court. Subject to defendants' evidentiary objection noted infra and plaintiffs' request to present a consumer perception survey as evidence at a later date, it was agreed that the hearing would also constitute trial on the merits of plaintiffs' claims for a declaratory judgment and permanent injunction. See Fed.R.Civ.P. 65(a)(2). The Court did not rule on plaintiffs' request and would treat such application as a motion to reopen for newly discovered evidence. On November 14, 1979, the Court granted plaintiffs' motion for a preliminary injunction. Defendants have appealed therefrom, but the Court will file its ruling on the merits in order to provide defendants an opportunity to present the entire matter at one time.

Plaintiffs claim the regulation is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law", 5 U.S.C. § 706(2)(A), on the following grounds, inter alia:

(1) Defendants failed to consider all relevant factors, including the danger that botulism, a deadly food poisoning, would develop in uncured products that are not properly refrigerated as well as the adequacy of the labeling requirements to prevent mishandling;

(2) The regulation was promulgated for the unlawful purpose of promoting a market for uncured products;

(3) The regulation's similarity requirement is an impermissibly subjective standard of identity that

(a) bears no rational relationship to the purposes of standards of identity;

(b) was beyond defendants' authority to promulgate; and

(c) represents a radical but unexplained departure from previous standards of identity;

(4) The regulation requires uncured products to resemble cured products but does not require uncured products to be labeled as "imitation"; and

(5) Defendants did not prepare or consider preparing an Environmental Impact Statement (EIS).

Defendants contend that the Administrator acted reasonably and for a lawful purpose; that the similarity requirement is proper in all respects; and that neither the label "imitation" nor an EIS is required.

Defendants also insist that the Court's review of plaintiffs' claims on the merits is limited to the administrative record.[1] Defendants rely upon *Federal Power Comm'n v. Transcontinental Pipe Line Corp.*, 423 U.S. 326, 331, 96 S.Ct. 579, 582, 46 L.Ed.2d 533 (1976); *Independent Meat Packers Ass'n v. Butz*, 526 F.2d 228, 239 (8th Cir. 1975), cert. denied, 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976); *Nickol v. United States*, 501 F.2d 1389 (10th Cir. 1974); and *Wilson & Co. v. United States*, 335 F.2d 788, 799 (7th Cir. 1964), cert. denied, 380

1. In this case the administrative record consists of the proposed rulemaking, the Final Impact Statement (FIS) prepared June 14, 1979 by FSQS, the transcript of FSQS's consultation with the Advisory Committee, and the final rule and other information published August 21, 1979.

U.S. 951, 85 S.Ct. 1082, 13 L.Ed.2d 968 (1965). Plaintiffs cite *Hiatt Grain & Feed, Inc. v. Bergland*, 446 F.Supp. 457, 467 (D.Kan.1978), aff'd on other grounds, 602 F.2d 929 (10th Cir. 1979), for the proposition that evidence outside the administrative record is admissible in order to assist the Court in understanding the technical, scientific and consumer perception issues presented; to assist the Court in determining whether an EIS should have been prepared; and to establish whether defendants have overlooked any relevant factors in promulgating the rule.

■ In a recent action for judicial review under 5 U.S.C. § 706(2)(A), the Eighth Circuit has held, on the basis of an extensive quotation from *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420–21, 91 S.Ct. 814, 825–26, 28 L.Ed.2d 136 (1971), that:

> [U]nless an inadequate evidentiary development before the agency can be shown and supplemental information submitted by the agency does not provide an adequate basis for judicial review, the court in conducting the plenary review mandated by *Overton Park* should limit its inquiry to the administrative record already in existence supplemented, if necessary, by affidavits, depositions, or other proof of an explanatory nature.

*Independent Meat Packers Ass'n v. Butz*, supra, at 239. In the instant case, the Court admitted evidence in support of and in opposition to plaintiffs' motion for a preliminary injunction. Its introduction for that limited purpose was not objected to. The Court admitted this same evidence on the merits of plaintiffs' claims for declaratory and permanent injunctive relief in order to permit the parties to make as complete a record as possible. In accordance with the principles set forth in *Independent Meat Packers* and *Overton Park*, supra, the Court has considered only the administrative record, supplemented by such explanatory evidence as is specifically noted hereinafter, in this ruling upon the merits of plaintiffs' claims. The evidence offered by the parties has not been considered for any other purpose.

## SCOPE OF REVIEW

■ Under 5 U.S.C. § 706(2)(A), the Court is required to make a "thorough, probing, in-depth review" of the defendants' action. *Overton Park*, supra, 401 U.S. at 415, 91 S.Ct. at 823. If that scrutiny discloses that the defendants acted outside the scope of their authority, *Schilling v. Rogers*, 363 U.S. 666, 676–77, 80 S.Ct. 1288, 1295, 4 L.Ed.2d 1478 (1960); failed to consider "all relevant factors", *Sabin v. Butz*, 515 F.2d 1061, 1069 (10th Cir. 1975); *United States v. Nova Scotia Food Products Corp.*, 568 F.2d 240, 251 (2nd Cir. 1977); failed to develop an adequate administrative record which supports necessary findings, *WAIT Radio v. Federal Communications Comm'n*, 135 U.S.App.D.C. 317, 320, 418 F.2d 1153, 1156 (D.C.Cir. 1969), cert. denied, 409 U.S. 1027, 93 S.Ct. 461, 34 L.Ed.2d 321 (1972); or failed to reach conclusions that are rationally supported by those findings, *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962); the administrative action will be deemed to be arbitrary, capricious, an abuse of discretion, and not in accordance with law and will be set side. Hence, agency action will not be sustained if "inadequacy of explanation frustrates review". *National Nutritional Foods Ass'n v. Weinberger*, 512 F.2d 688, 701 (2nd Cir.), cert. denied, 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 445 (1975). See also *United States v. Nova Scotia Food Products Corp.*, supra; *Environmental Defense Fund, Inc. v. Ruckelshaus*, 142 U.S.App.D.C. 74, 439 F.2d 584 (D.C.Cir. 1971).

## I.

Plaintiffs claim that since products preserved without nitrate or nitrite will have the name, appearance, taste and consistency of products preserved with nitrate or nitrite, consumers will be inclined to handle the unpreserved product in the way preserved products have been handled and thereby expose themselves to a greater risk of botulism. They contend that the label-

ing requirements will not alert the consumers of the unpreserved products of the danger to their health if those products are not properly refrigerated. Plaintiffs claim defendants acted arbitrarily and capriciously in issuing "a regulation which permits nitrite-free products to be sold under the disguise and name of nitrite-cured products such that consumers, unwarned of the switch, will handle the new product unsafely". In this connection, plaintiffs claim that defendants failed to consider (1) the potential for botulism if uncured products are treated in the same manner cured products have been treated, and (2) whether the required labeling will sufficiently alert the consumer to the differences in the safe handling characteristics of the two types of products.

Defendants claim that USDA considered all relevant factors, applied its experience and expertise, and made a reasonable judgment as to consumer behavior which should not be overturned by this Court. They contend that the labels are not misleading and that the Administrator had a rational basis for his conclusion that the labels would adequately inform consumers of the nature and handling requirements of the unpreserved products.

Plaintiffs' evidence at trial was primarily directed toward (1) whether consumers would read, understand and believe the labels on the unpreserved products, and (2) the likelihood that botulism would develop in unpreserved products not refrigerated in accordance with the instructions on the labels. The Court's task here is not to decide these issues but to determine whether defendants adequately considered them.

Upon the basis of the administrative record, the Court finds the regulation invalid for the reasons, inter alia, that there is no rational basis in the administrative record for the Administrator's conclusion that the information on the labels of the uncured products is adequate to prevent consumers from confusing the uncured products with the cured products, and defendants failed to consider the relevant factor of whether consumers handle cured products in a manner such that botulism would develop in uncured products handled in the same manner.

In the notice of the proposed rule, the Administrator recognized that meat products prepared without nitrates or nitrites "may better support the growth and toxin production of *Clostridium botulinum* [than] meat products prepared with the traditional levels of nitrate and/or nitrite currently permitted by regulation" and that "*Clostridium botulinum* intoxication (botulism) is a type of food poisoning which often causes death." 43 Fed.Reg. 18193 (April 28, 1978). He concluded, and plaintiffs agree, that meat products prepared without nitrate or nitrite should be refrigerated at or below 40°F. at all times in order to be protected from botulism. *Id.* at 18194. The Administrator also recognized the potential confusion among consumers between traditionally cured products and the products to be marketed under the proposed rule. He proposed the special labeling requirements for products prepared without nitrate or nitrite, "since meat products prepared with no nitrate or nitrite . . . could be confused with products containing the traditional levels of nitrate and/or nitrite." *Id.*

Numerous comments regarding the proposed rule suggested that consumers have developed established handling practices and uses for traditionally cured products whereby such products are not always refrigerated below 40°F. prior to preparation for consumption; that consumers would not read, understand or believe the proposed labels for the unpreserved products; that consumers would be confused or deceived by the similarity of the uncured products to the cured products; that consumers would handle the uncured products in the same fashion as cured products; and that botulism would develop in the uncured products as a result. See, e. g., Comments 253, 258, 260, and 280. Members of the Advisory Committee and defendant Foreman's own assistant expressed much the same concerns. See the Transcript of July 18, 1979, Consultation with the Advisory Committee, pages 70, 71, 76.

The Administrator noted that there was an issue as to whether cured products had been handled in a manner such that botulism would develop in uncured products handled in the same manner. *Id.* at 69–70. In the preamble to the final rule, he recognized the potential for confusion if cured and uncured products were marketed under the same name and the question whether the proposed labeling provisions would be adequate to protect against botulism in the unpreserved products. 44 Fed.Reg. 48959 (August 21, 1979). He concluded that the information on the final label, with the addition of the term "uncured", would prevent botulism by informing consumers of the difference between the two types of products and the need to refrigerate the uncured products. Based on his awareness "that products requiring . . . special handling such as pork sausage, bratwurst and brockwurst have presented no apparent health hazards even though prepared without nitrates or nitrites and marketed unfrozen", *Id.* at 48960, he concluded

> that consumers have demonstrated a knowledge of the handling practices necessary for any of such products prepared without nitrates or nitrites and that the prescribed labeling for such products, i. e., 'Not Preserved—Keep Refrigerated Below 40°F. At All Times', will adequately inform the consumer of how to maintain such products in a wholesome condition until consumed.

*Id.* "In addition [to this information, he] determined, based on the comments, that the use of nitrates and nitrites is of such importance in products preserved by these substances, that products prepared without such substances should have different names from those prepared with nitrates or nitrites in order to more clearly distinguish such products." *Id.* at 48959. He concluded that the term "Uncured" would sufficiently distinguish such products because "[t]he term 'Uncured' in the labeling of a meat food product is commonly understood to mean that the product does not contain nitrates or nitrites, and that the product was not preserved with salt." *Id.*

The Administrator determined that the uncured products should be refrigerated below 40°F. in order to prevent the development of botulism. The comments suggested and defendants admit that traditionally cured products have not always been so handled. The Administrator did not make any determination regarding the risk that botulism might develop in uncured products handled in the same manner cured products have been handled. Rather, he concluded that the uncured products would not be handled as cured products because the labels on the uncured products would distinguish them from the cured products and inform the consumer how to handle them properly. This conclusion was based upon his determination that the term "uncured" is commonly understood to mean "prepared without nitrates or nitrites" and his awareness that the marketing of other uncured products, such as pork sausage, bratwurst and brockwurst, has presented no health problem.

The term "uncured" is apparently understood by some to mean that a product is prepared without nitrates or nitrites. See Comments 83, 92, 122, 156, 157, 182, 192, and 238. The impetus for the rule change came from the producers of non-nitrite or nitrate preserved products and consumers who were concerned with the possible carcinogens in foods preserved by them. Similar non-nitrite products are available, but consumers claimed they have had difficulty locating them in the stores since they did not carry the traditional names. Many comments about the proposed rule change came from such consumers. To conclude, on the basis of the comments of persons interested in the controversy, that the 200 million consumers in this country generally share defendants' definition is irrational. Furthermore, unlike previously marketed uncured products, the uncured products permitted by defendants' regulation will be similar in size, appearance, taste and consistency to cured products. There is no rational basis in the administrative record for the conclusion that ordinary consumers, faced with a long-established product and a new product that differs only in the infor-

mation on its label, will distinguish between the two products.

The Court agrees with defendants' argument that a fair respect for a statute that is primarily a regulation of labels requires rejection of an attack predicated on the notion that consumers are incapable of following instructions because of total illiteracy or universal disregard of instructions. See *Stearns Electric Paste Co. v. Environmental Protection Agency*, 461 F.2d 293, 310 (7th Cir. 1972). See also *Southern National Mfg. Co. v. Environmental Protection Agency*, 470 F.2d 194, 200 (8th Cir. 1972). However, it has long been recognized that few consumers read all of the information on labels and many cannot read labels at all. *Houston v. St. Louis Independent Pkg. Co.*, 249 U.S. 479, 487, 39 S.Ct. 332, 335, 63 L.Ed. 717 (1919). See also *Federation of Homemakers v. Butz*, 151 U.S.App.D.C. 291, 295, 466 F.2d 462, 466 (D.C.Cir. 1972). Indeed, the Secretary of Agriculture himself has argued that consumers do not read everything on a label and that even those who do might not understand all of the information thereon. *Armour and Co. v. Freeman*, 113 U.S.App.D.C. 37, 46, 304 F.2d 404, 413 (D.C.Cir.), cert. denied, 370 U.S. 920, 82 S.Ct. 1559, 8 L.Ed.2d 500 (1962) (Prettyman, J., concurring). Recognition of these facts is not "a blow at the whole theory of labeling", as some might hold. See Id. Rather, it is an acknowledgment of "the inability of consumers in some cases to determine, solely on the basis of informative labeling, the relative merits of a variety of products superficially resembling each other." *Federal Security Administrator v. Quaker Oats Co.*, 318 U.S. 218, 230–31, 63 S.Ct. 589, 596, 87 L.Ed. 724 (1943) (footnote omitted).

The testimony of Mr. Fried, Acting Director of Products Standards and Labels, was not particularly helpful to defendants. He had no background to testify as an expert on consumer habits in reading labels or caring for nitrite preserved products. His primary reason for believing consumers would be protected was based on his experience that consumers put products displayed on shelves in the pantry and place products displayed in refrigerated cases in the refrigerator. This is a pragmatic observation that is probably accurate, but it does not aid the defendants here because the nitrite preserved products are also sold from refrigerated cases. The Court feels strongly that the defendants failed to give adequate consideration to the dangers of botulism and to consumer conduct in reading labels and caring for nitrite products.

Although the Court would have felt more comfortable in reviewing the defendants' agency action if the public health arguments had been advanced by parties with a less direct economic interest in the outcome of this lawsuit, the Court is persuaded that the fears are genuine and that the USDA failed to give adequate attention to the dangers of botulism, the manner in which the public cares for nitrite preserved products and the effectiveness of labeling. The Court believes the USDA acted arbitrarily and capriciously in promulgating the questioned rule and in establishing the labeling standards.

## II.

Plaintiffs claim that the regulation was promulgated for the unlawful purpose of promoting or encouraging a market for uncured products, thus favoring one class of producers over another. The FIS prepared June 14, 1979 states that the purpose of the final rule

> is to allow the use of familiar names for the traditional, but nitrite-free processed meat products. Allowing these products to be marketed by traditional names will increase consumer awareness of their availability as well as consumption by those wishing to forego consumption of nitrite cured products.

The FIS also states that defendants considered the alternative of taking no action with regard to uncured products but rejected that option "because it does not facilitate the development of markets for nitrate and/or nitrite-free products".

Defendants do not claim that the purpose ascribed to the regulation by plaintiffs is a

proper one. They deny that plaintiffs' statement of the purpose of the regulation is correct and claim that the regulation is designed to make available to consumers who wish them, products that are similar to traditional products yet free of nitrates and nitrites, which are suspected but unproven carcinogens. Defendants claim that in adopting the final rule, the Administrator simply allowed the market to grow in response to consumer demand. The administrative record does not support this contention. Almost 170 uncured products were available on the market under their own names at the time the rule was adopted. To permit the use of the traditional names and to require similarity between cured and uncured products were not necessary to make the products available to those who wanted them. Therefore neither the use of the traditional names nor the similarity requirements bear a rational relationship to the claimed purpose of availability. As indicated earlier, those who wished to enjoy similar products without nitrates or nitrites instigated the rule change for their own convenience.

Defendants claim that "the final rule represents the effort of defendants to offer consumers the opportunity of obtaining pork products under their traditional names, . . . but without ingredients which many believe to be carcinogenic" and that they "acted reasonably . . . in balancing the public health . . . interests involved in this case." They imply that the purpose of the rule is to promote the public health by reducing the incidence of cancer in Americans. However, section 4(b) of the APA, 5 U.S.C. § 553(c), states that "the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." Neither the proposed rule, the FIS, nor the final rule give any indication that such is the purpose of the final rule. Nor has research progressed to the point that the defendants could justifiably claim such purpose. Regardless of the alleged purpose, the nature and text of the questioned regulations clearly has the effect of increasing the marketability of uncured products. The Court

can only conclude that approval of the use of traditional names and the similarity requirement in the final rule was given by the Administrator for the purpose of facilitating markets for uncured products, and thereby increasing the consumption of those products, at the expense of producers of cured products. Such purpose is not proper. This is not to say that, under proper labeling, uncured products that are similar to nitrite preserved products, are not welcome additions to the market place. However, it is not claimed and it cannot be held that the Federal Meat Inspection Act of 1907 (the Meat Act) allows the Administrator to take it upon himself to actively promote the marketing of a meat product. See 21 U.S.C. §§ 602, 607(c). See also Part III, infra.

### III.

Plaintiffs claim that the regulation is contrary to the Meat Act, 21 U.S.C. §§ 601 et seq., because of the requirement that uncured products be found by the Administrator to be similar in size, flavor, consistency, and general appearance to cured products. They contend that this similarity requirement is a subjective standard of identity and that previous standards of identity or composition have always been objective recipes or formulas listing permissible or required ingredients and the percentages thereof in the product prescribed by the standard. They claim (1) that the subjective nature of the similarity requirement represents a radical departure from previously promulgated standards and that defendants were therefore required to give a reasoned explanation for their departure from long-established administrative precedent; (2) that the purpose of standards of identity requires such standards to be based upon objective criteria, not subjective factors such as taste and general appearance; (3) that the similarity requirement bears no rational relationship to the purpose of standards of identity; and (4) that a subjective standard of identity is beyond defendants' authority.

Defendants contend that the similarity requirement is only a recent example of accepted, unchallenged USDA policy and practice. They argue that few of the 45 meat product standards promulgated by USDA could be characterized as mandatory recipes which specify mandatory ingredients in specific amounts. They also claim that USDA currently regulates factors such as general appearance and flavor on a regular basis. They point to 9 C.F.R. § 319.80 (1979), which requires barbecued meats to be so cooked as "to assume the usual characteristics of a barbecued article", and 9 C.F.R. § 319.181 (1979), which requires "cheesefurters" to "contain sufficient cheese to give definite characteristics to the finished article."

The Court believes that the similarity requirement is unlawful for three reasons. First, the similarity requirement is a standard of identity that bears no rational relationship to the purpose of such standards. Section 7(c) of the Meat Act, 21 U.S.C. § 607(c), authorizes the Secretary of Agriculture to prescribe standards of identity or composition for meat products "whenever he determines such action is necessary for the protection of the public." The precise parameters of the Secretary's authority have not been defined by case law. However, the Court does not believe that the Secretary's authority is broad enough to validate the similarity requirement of the final rule.

The legislative history to the 1967 amendments to the Meat Act indicates that the Secretary's authority to issue standards of identity or composition under the Meat Act is based primarily upon *Brougham v. Blanton Mfg. Co.*, 249 U.S. 495, 39 S.Ct. 363, 63 L.Ed. 725 (1919), and *Houston v. St. Louis Independent Pkg. Co.*, 249 U.S. 479, 39 S.Ct. 332, 63 L.Ed. 717 (1919), two cases emphasizing the Secretary's power to prevent deceptive labeling and marketing of meat products by requiring adherence to what have come to be known as standards of

identity or composition. S.Rep.No. 799, 90th Cong., 1st Sess. (1967), reprinted in 1967 U.S.Code Cong. & Admin.News, pp. 2188, 2198. In *Federal Security Administrator v. Quaker Oats Co.*, 318 U.S. 218, 63 S.Ct. 589, 87 L.Ed. 724 (1943), the Supreme Court indicated that the primary purpose of standards of identity promulgated under § 401 of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 341, is

> to protect the consumer from 'economic adulteration,' by which less expensive ingredients were substituted, or the proportion of more expensive ingredients diminished, so as to make the product, although not in itself deleterious, inferior to that which the consumer expected to receive when purchasing a product with the name under which it was sold.

*Id.* at 230, 63 S.Ct. at 596. In reliance upon *Quaker Oats*, the court in *Armour and Co. v. Ball*, 468 F.2d 76 (6th Cir. 1972), cert. denied, 411 U.S. 981, 93 S.Ct. 2267, 36 L.Ed.2d 957 (1973), concluded that one purpose of the Meat Act is "to empower the Secretary to adopt definitions and standards of identity or composition so that the 'integrity' of meat food products could be 'effectively maintained'." *Id.* at 81.

The similarity requirement in the regulation at issue here does not purport to further the purposes of standards of identity as stated in the cases outlined above. It will not prevent the "economic adulteration" or promote the "integrity" of meat food products. Contrary to the purposes of the standards, the similarity requirement will confuse, if not deceive, consumers as to the identity of the products they are receiving and the handling requirements of those products.

Second, the Court believes the requirement that uncured products be found by the Administrator to be similar in taste to cured products is a subjective standard of identity that is beyond defendants' authority to promulgate or enforce.[2]

2. Defendants contended during final argument that plaintiffs lack standing to raise any issue regarding the subjective nature of the taste requirement. No citation of authority or further explanation was offered. Apparently, defendants' argument is based upon the fact that plaintiffs were never denied approval of a label for an uncured product on the ground that the

A standard of identity "normally sets forth a 'recipe' for a food". *American Frozen Food Institute v. Mathews*, 413 F.Supp. 548, 554 (D.D.C.1976) aff'd on other grounds, 181 U.S.App.D.C. 122, 555 F.2d 1059 (D.C.Cir. 1977). "[I]t defines the composition of a food, prescribes mandatory as well as optional ingredients and establishes amounts or relative proportions of ingredients." *Id.* at 550. Many standards of identity for meat food products do not specify mandatory ingredients in specific quantities, yet they are nevertheless "recipes" based upon objective criteria. Although the "barbecued meats" and "cheesefurter" standards cited by defendants may appear to contain requirements as to how such products must taste, the Administrator stated to the Committee that USDA does not regulate flavor and taste. The reasons why USDA does not do so should be obvious. As disclosed at trial, a committee of three persons in USDA will make a subjective judgment as to the similarity of the uncured products to the cured products in approving the label. Compliance is monitored by an inspector in each plant. A standard that depends upon a subjective judgment as to taste would be impossible for USDA to apply in an even-handed manner. The product could vary with the subjective decision of each inspector. No objective guidelines could be established. The approval of the label of an uncured product would amount to an endorsement by USDA of the similarity of such product to its cured counterpart. The degree of confidence that a consumer could place in the integrity of an uncured product would, as plaintiffs contend, "depend quite literally on what the Administrator ate for breakfast".

Third, even if a subjective standard of identity were within the Administrator's power to prescribe, the requirement that uncured products be similar in taste to cured products is unlawful for another rea-son. As indicated above, similarity of taste has never been an element of a standard of identity. With few or no exceptions, standards of identity have been objective in nature. The requirement that uncured products taste like cured products is so unorthodox and contrary to previous USDA policy and practice that it was incumbent upon defendants to give a reasoned explanation for their decision to impose the requirement. Their failure to do so necessitates remand of the regulation at a minimum. See *Tabor v. Joint Board for Enrollment of Actuaries*, 566 F.2d 705, 711 (D.C. Cir. 1977); *Greyhound Corp. v. Interstate Commerce Comm'n*, 179 U.S.App.D.C. 228, 230, 232, 551 F.2d 414, 416, 418 (D.C.Cir. 1977). See also *Secretary of Agriculture v. United States*, 347 U.S. 645, 653, 74 S.Ct. 826, 831, 98 L.Ed. 1015 (1954).

## IV.

Plaintiffs also claim that the regulation is contrary to law because it requires the uncured products to imitate familiar cured products but fails to require the uncured products to bear the label "imitation" as required by 21 U.S.C. § 601(n)(3). They argue that the cured and uncured products differ in that the latter must contain added flavoring or coloring in order to resemble the cured products and also require refrigeration. They further contend that the addition of flavoring and coloring to the uncured products renders them inferior to the cured products. Plaintiffs claim that USDA has exceeded its authority in deviating from the statutory requirement that imitations be labeled as such. They rely upon *Swift & Company v. Walkley*, 369 F.Supp. 1198 (S.D.N.Y.1973), wherein the court chastised USDA for approving the labeling of a product known as "All American Fun-Links" "based not on a finding that it was not an imitation frankfurter,

---

product was not found to be similar in taste to its cured counterpart. If such is defendants' contention, it is based upon an unduly narrow concept of standing in that its focus is upon a single issue rather than the entire case. Plaintiffs NPPC and IMPA unquestionably have standing to challenge defendants' regulation.

The validity and effect of the similarity requirement contained in 9 C.F.R. § 317.17(b) is the principal challenge to the regulation because it is the similarity requirement that plaintiffs allege will be the chief cause of consumer confusion, the danger of botulism, and the resulting economic loss to the associations' members.

but rather upon acceptance of the view . . . that '[c]onsumers are reluctant to purchase products labelled "imitation" even though the products are very good and highly nutritious'." *Id.* at 1200. Plaintiffs claim that here, as in *Walkley*, USDA has disregarded the mandate of section 601(n)(3) because of its lack of confidence in the public's buying judgment. The Court does not believe plaintiffs' argument is applicable to these facts. The product at issue in *Walkley* was found to be an imitation frankfurter; the uncured products at issue in the instant case are not imitations of their cured counter-parts, and to label them as such would be deceptive.

Title 21 U.S.C. § 601(n)(3) is a part of the Meat Act and states that a meat food product is "misbranded"

> if it is an imitation of another food, unless its label bears, in type of uniform size and prominence, the word 'imitation' and immediately thereafter, the name of the food imitated . . . . .

Whether one food product is an imitation of another depends of course upon the meaning to be given to the term "imitation". The Meat Act provides no definition. Defendants urge the Court to define an imitation food as a food which is "a substitute for and resembles another food but is nutritionally inferior to that food". The source of defendants' definition is 21 C.F.R. § 501.-3(e)(1) (1979), formerly 21 C.F.R. § 1.8(e)(1) (1975), a regulation promulgated by the Food and Drug Administration (FDA) to define an imitation food subject to section 403(c) of the Federal Food, Drug, and Cosmetic Act (FDCA) 21 U.S.C. § 343(c).

The FDA regulation and its definition of the term "imitation" were held to be reasonable and proper in *Federation of Homemakers v. Schmidt*, 176 U.S.App.D.C. 261, 539 F.2d 740, 743–44 (D.C.Cir.1976). The pertinent provisions of the FDCA and the Meat Act are similar in their express terms, and the purpose of each is to prevent misbranding. To apply here the definition espoused by defendants would appear to be reasonable at first blush. To do so would require the Court to hold that the uncured

products need not be labeled imitation, because plaintiffs do not argue, and there is no basis for concluding, that the uncured products permitted by USDA's regulation are in any way "nutritionally" inferior to cured products. However, USDA's failure to adopt FDA's definition by regulation, and the absence of any indication that such definition was actually applied by the Administrator in the instant case, lead the Court to believe that the definition to be applied here is not the one adopted by the FDA but rather the one developed by case law.

In *62 Cases of Jam v. United States*, 340 U.S. 593, 71 S.Ct. 515, 95 L.Ed. 566 (1951), a case arising under section 403(c) of the FDCA, the Supreme Court stated that the meaning of the word "imitation" must be "left . . . to the understanding of ordinary English speech". *Id.* at 599, 71 S.Ct. at 519. In *United States.v. 651 Cases, Etc.*, 114 F.Supp. 430 (N.D.N.Y. 1953), the court noted that "[t]he word [imitation] connotes inferiority . . . in the sense that [the product] is cheapened by the substitution of ingredients" and that "[r]esemblance alone is not enough to constitute imitation". *Id.* at 432 · (citations omitted). Applying these standards to the instant case, the Court is convinced that the uncured products at issue need not and should not be labeled "imitation". Despite the fact that under the USDA's regulation, they must be similar in size, flavor, consistency and general appearance to the cured products, the nature of the differences between the cured and uncured products is not such that the latter would be commonly understood or said to be imitations of the former. The presence of added flavoring or coloring, as well as the special refrigeration requirements, might make the uncured products less desirable than the cured products in the minds of some. However, the presence of nitrates or nitrites in the cured products will make those products less desirable in the minds of others. Moreover, the substitution of flavoring and coloring for nitrates or nitrites cannot fairly be said to cheapen the cured product or render the

uncured product inferior. It is the failure to properly refrigerate an uncured product which will make it inferior. Improper handling of an uncured product will not make the product an imitation of a cured product but a dangerous food product that could not be approved under any label.

V.

Plaintiffs also claim that the rule was contrary to law because it has a high potential for significantly affecting the quality of the human environment in an adverse manner by making certain foods hazardous to the health of unwary consumers and an Environmental Impact Statement (EIS) should have been prepared as required by the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 et seq., and USDA's own policy on NEPA. See 39 Fed. Reg. 18678 (May 29, 1974). They claim USDA was at least required to assess all relevant factors (such as consumer label reading practices), state its reasons for not preparing an EIS, and develop a record supportive of its decision not to file an EIS. In response, defendants argue that no EIS is required because the regulation is not a "major" federal action and is not alleged to have a substantial effect on the "environment"; that the Court's review of the decision not to file an EIS is limited to a standard of reasonableness; and that the Final Impact Statement (FIS) prepared by USDA on June 14, 1979 shows that USDA properly exercised its discretion not to file an EIS. By way of reply, plaintiffs contend that the promulgation of the regulation was a "major" federal action significantly affecting the quality of the human "environment"; that the administrative record contains no reference to a decision to file or not file an EIS; and that defendants' failure to consider environmental factors,

make a decision whether to file an EIS, and develop a reviewable administrative record of such considerations and decision, is fatal to the regulation.[3]

■ The Court believes that the regulation at issue was promulgated contrary to law. Both the administrative record and the record made at trial are devoid of any indication that defendants made an express determination as to whether the preparation of an EIS was required. USDA's Policies and Directives, which state that "[e]ach USDA agency must use good judgment in determining when EIS's are required", indicate that a determination must be made. 39 Fed.Reg. 18678, 18679 (May 29, 1974). If a decision not to prepare an EIS is made, a statement of the reasons for that decision is required, *Scientists' Institute for Public Information, Inc. v. Atomic Energy Comm'n*, 156 U.S.App.D.C. 395, 410–11, 481 F.2d 1079, 1094–95 (D.C.Cir. 1973), and a reviewable administrative record supporting the decision must be developed. *Nucleus of Chicago Homeowners Ass'n v. Lynn*, 524 F.2d 225, 231 (7th Cir. 1975), cert. denied, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976). No such record was made here.

■ Defendants' arguments that an EIS was not required in this case are post hoc rationalizations for the failure to consider the issue of preparation of an EIS, not reasons for a decision that an EIS was not required. USDA recognizes that its promulgation of a regulation is a federal action for NEPA purposes. 39 Fed.Reg. 18678, 18679 (May 29, 1974). "It is clear that NEPA was designed to cover almost every form of significant federal activity." *Chelsea Neighborhood Ass'ns v. United States Postal Service*, 516 F.2d 378, 382 (2d Cir. 1975). USDA has stated that controversy is a factor in determining whether a federal

---

**3.** Plaintiffs also contend that the recently promulgated regulations of the Council on Environmental Quality (CEQ), as set forth in 40 C.F.R. §§ 1500.1 et seq. (1979), require the preparation of an EIS. Defendants have not responded to this contention. The CEQ regulations became effective on July 30, 1979, well over one year after defendants' publication of the notice of proposed rulemaking and less

than one month prior to the publication of the final rule. Although the CEQ regulations were promulgated on November 29, 1978 and are to be applied to the fullest extent possible to activities ongoing at that time, see 40 C.F.R. § 1506.12 (1979), the parties have not argued the practicability of their application and the Court does not premise its decision in this case upon their applicability.

action is "major". 39 Fed.Reg. 18678, 18679 (May 24, 1974). The promulgation of the regulation was not an insignificant government activity. The proposed rule generated 365 comments from a broad range of the public, and considerable public controversy. The adoption of the regulation was a major federal action. Furthermore, the possible occurrence of botulism as a result of consumer mishandling of uncured products is an "environmental" effect because significant public health concerns are implicated by the regulation. Cf. *National Organization for Reform of Marijuana Laws v. United States Department of State*, 452 F.Supp. 1226 (D.D.C.1978); *Sierra Club v. Coleman*, 405 F.Supp. 53, 55 (D.D.C.1975), rev'd on other grounds sub nom. *Sierra Club v. Adams*, 188 U.S.App.D.C. 147, 578 F.2d 389 (D.C.Cir. 1978). See also 40 C.F.R. §§ 1508.-8(b), 1508.27(b)(2) (1979).

Defendants' argument that the FIS indicates that USDA properly exercised its discretion not to file an EIS is without merit. An FIS was never intended to take the place of an EIS, see 43 Fed.Reg. 21987 (May 22, 1978), and defendants do not contend that the FIS prepared on June 14, 1979 was prepared and circulated in accordance with 42 U.S.C. § 4332(2)(C). Even if the FIS could be considered to be an EIS, the conclusion stated in the FIS that the "regulation is not expected to result in any increase in incidence of food poisoning from *Clostridium botulinum*" would have to be rejected as arbitrary, capricious and unreasonable due to defendants' failure to consider all relevant facts in reaching that conclusion. See Part I, supra.

The Court does not hold that defendants were or are required to prepare an EIS. This question should be left to USDA in the first instance, subject to limited judicial review under the APA. See *County of Trinity v. Andrus*, 438 F.Supp. 1368, 1388 (E.D.Cal.1977). The Court holds only that defendants' failure to make a determination as to whether an EIS should have been prepared and their failure to develop a reviewable administrative record supporting a negative decision were arbitrary, capricious, and unreasonable and invalidate the regulation.

IT IS THEREFORE ORDERED that 9 C.F.R. § 317.17(b) and (c) and § 319.2, 44 Fed.Reg. 48961 (August 21, 1979) hereby are declared to be arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

IT IS FURTHER ORDERED that defendants and their officers, agents, servants, employees, or successors and attorneys and those in active concert or participation with them are hereby permanently enjoined and restrained from enforcing or applying 9 C.F.R. § 317.17(b) and (c) and § 319.2, 44 Fed.Reg. 48961 (August 21, 1979).