UNITED STATES of America, Plaintiff,

v.

ARTICLES OF DRUG, et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

MIDWEST PHARMACEUTICALS, INC., et al., Defendants.

Nos. CV–84–0–206, CV–84–0–323.

United States District Court, D. Nebraska.

April 2, 1986.

 

Paul Johns, Asst. U.S. Atty., Omaha, Neb., William Spiller, Food & Drug Admin., Washington, D.C., for plaintiff.

John M. O'Connor, DeForest & Duer, New York City, for defendants.

## MEMORANDUM OPINION

STROM, District Judge.

This matter is before the Court for decision after trial to the Court of consolidated actions for condemnation of seized products pursuant to 21 U.S.C. § 334(a) and for injunction pursuant to 21 U.S.C. § 332.

## GENERAL FACTS

On April 5, 1984, law enforcement officials from the United States Food and Drug Administration seized approximately fifteen tons of drug products from Midwest Pharmaceuticals, Inc. (defendant and claimant herein). Plaintiff (hereinafter "the government") contends that the drug products are misbranded within the meaning of 21 U.S.C. § 352(i)(2) which prohibits the sale of "imitation" drugs, and are thus subject to in rem seizure under the provisions of 21 U.S.C. § 334. The government also seeks to enjoin Midwest and its president, Steven Sommers, under 21 U.S.C. § 332(a), from selling the same or similar products in the future. Midwest is claimant of the products.

## PROCEDURAL HISTORY

On April 5, 1984, the government filed a complaint for forfeiture of certain articles of drugs. The complaint (as amended) alleged that the drug products described in the caption were misbranded in that they were "imitations" of another drug in violation of 21 U.S.C. § 352(i)(2) by virtue of physical appearance, physiological effects, and the manner in which they were advertised, marketed and distributed and sold. Midwest filed a claim for the seized drug products, an answer and counterclaim. The counterclaim alleged harassment, abuse of process and negligence on the part of the government.

The government additionally filed a separate action for injunctive relief against Midwest and its president alleging continued marketing of drugs by Midwest in violation of § 352(i)(2) and seeking an order from the Court enjoining future marketing. Defendants Midwest and Sommers answered, denying the government's allegations. The government's motion for a temporary restraining order in that case was denied (Filing No. 64). The two actions were consolidated on August 21, 1984, for pretrial discovery and trial.

The government thereafter moved for dismissal of claimant's counterclaims in the in rem action asserting that seizure actions taken by the government were discretionary functions exempted under the Federal Tort Claims Act, 28 U.S.C. § 2680(a). Midwest moved for summary judgment in its favor on both actions asserting that 21 U.S.C. § 352(i)(2) is unconstitutionally vague, that the term "imitation" in 21 U.S.C. § 352(i)(2) must be equated with "counterfeit," and that the drugs seized were not "counterfeit" because of differences in markings.

The matter was referred to U.S. Magistrate Peck for findings and recommendations pursuant to 28 U.S.C. § 636. Magistrate Peck recommended the government's motion to dismiss should be sustained, claimant's counterclaims dismissed and Midwest's motions for summary judgment should be denied. The magistrate found § 352(i)(2) was not unconstitutionally vague and the word "imitation," which is the practice of passing off one substance as a different substance, is not equated with "counterfeit," which refers to simulating another's identifying mark on a product (Filing No. 49).

Midwest objected to the findings and recommendations of the magistrate, asserting that a distributor may not be enjoined for the alleged improper actions of persons over whom the distributor has no control. The late Honorable Albert G. Schatz rejected that argument, holding the doctrine of extended or contributory liability applicable in an action alleging violations of the Food, Drug and Cosmetic Act, 21 U.S.C. § 301, et seq. The Court further held that manufacturers and distributors may be held contributorily liable for alleged violations of 21 U.S.C. § 352(i)(2) if they intentionally induced another to commit any such violation, or if they knew or reasonably could have anticipated that a substantial portion of their products would be passed off as controlled substances in the chain of distribution. The Court also adopted the recommendations of the magistrate. *United States v. Articles of Drug*, 601 F.Supp. 392 (D.Neb.1984).

The case went to trial on February 25, 1986. The issues remaining for decision by the Court at the time of trial were: (1) whether the products seized were "imitations" under the purview of § 352(i)(2), thus subject to seizure under 21 U.S.C. § 331(a); (2) whether Midwest intentionally induced another to violate § 352(i)(2) or knew or reasonably should have anticipated that a substantial portion of its products would be passed off as controlled substances in the chain of distribution; and (3) whether defendants should be enjoined from marketing such products in the future.

## FINDINGS OF FACT

The Court adopts findings of fact set forth in its earlier discussion. The Court further finds:

1) Midwest Pharmaceuticals, Inc., is incorporated in the State of Iowa; it does business as Midwest Pharmaceuticals, B & S Distributors and U.S.A. Drugs.

2) Defendant Steven F. Sommers is president of Midwest. He has been president since January 1, 1984. Robert Liebert is former president. Since January 1, 1984, Sommers and members of his household have been sole stockholders and owners of Midwest. Sommers has no formal training in pharmacy or pharmacology.

3) Midwest was located in Council Bluffs, Iowa, from 1980 to June 30, 1982. Iowa's Imitation Controlled Substance statute took effect on July 1, 1982. Midwest

was located in Omaha, Nebraska, from June 30, 1982, to May, 1985. Nebraska's Imitation Controlled Substances statute became effective on May 23, 1985. Midwest is presently located in Council Bluffs, Iowa.

4) Midwest markets capsule and tablet over-the-counter drug products containing caffeine, ephedrine or phenylpropanolamine. Midwest also markets powdery and sticky substances characterized by Midwest as incense.

5) Midwest sells its products by mail order; products are sent to customers by mail or U.P.S. after receiving orders by telephone. Payment is usually received c.o.d.

6) Midwest buys ninety-eight per cent of its products from Gemini Pharmaceuticals in New York. At the time of the seizure in April, 1984, Midwest was holding its products for sale after shipment in interstate commerce.

7) Midwest sells its products in bottles containing one hundred dosage units, two hundred fifty dosage units and one thousand dosage units. Ninety-two per cent of the containers seized by the FDA in April, 1984, were containers of one thousand dosage units. Approximately four times as many dosage units were packaged in one thousand lot bottles than in one hundred lot bottles. According to testimony of Mary Starr, a Midwest employee, Midwest presently averages weekly sales of three hundred thousand dosages packaged in one thousand lot containers and eight thousand dosages packaged in one hundred lot containers. FDA Inspector Nielson testified that a review of Midwest's invoices from January through December, 1984, showed that Midwest sold 245 million dosage units during that time.

8) Midwest advertises its products in magazines such as "Stag," (Exhibit 72), which bears the logos "Hard Core for '84" and "Triple XXX Porn Review;" "Partner," (Exhibit 73), subtitled "King of the Skin Mags," "Iron Horse," (Exhibit 75), "Club," (Exhibits 78 and 78A); "High Times," (Exhibit 70 and Exhibit 60); and "Hustler."

9) Midwest's advertisements (Exhibits 70, 72, 73, 75 and 75A, 78 and 78A), contain descriptions of their products as "legal body stimulants" and "sleep aids." Most contain pictures of the capsules and tablets with descriptive phrases such as ".357 Magnum," "20/20," "30/30," "white mole," "black mole," "mini-pink heart," and "mini-white—thick or thin." None contain any information as to the ingredients, indications or contra-indications of the products.

10) In 1982, Midwest enclosed product cards in customer orders which showed pictures of their products as a form of advertisement (Exhibits 80, 81 and 82). None contained any information regarding ingredients, indications or contraindications of the products other than the phrase "stimulants and sleep aids." One product card (Exhibit 80) showed, among other capsules and tablets, yellow capsules with markings "RJS" or "RJ8" and "RUS." Those capsules are crossed off a later product card (Exhibit 81).

11) In 1980, Steve Sommers and Bob Liebert encouraged a customer, Ken Maschmeier, to sell their products by passing them off as controlled substances. In 1981 and 1982, Daniel Bengtson, another Midwest customer, told Sommers and Liebert that he was selling Midwest's products as controlled substances. He misrepresented and sold a white powdery substance as cocaine, hard yellow tablets imprinted "Lemmon 714" as the controlled substance "Quaalude", and small white double-scored tablets as amphetamine.

12) Amphetamines, barbiturates, tranquilizers, cocaine and hashish are controlled substances. The products are either manufactured by legitimate pharmaceutical companies or clandestinely manufactured. The U.S. Drug Enforcement Agency (DEA) maintains a registry and reference library of samples of such substances. Exhibits 1, 2, 3, 4, 5, 6, 7, 10, 11, 12, 13, 15, 16, 17, 18, 19, 20, 22, 23, 24, 25, 26, 27 and 32 are examples of controlled substances in capsule or tablet form.

13) The Court has visually examined the controlled substances, the drug products seized from Midwest in April, 1984, and the drug products seized in November, 1983. Most of the Midwest products seized in April, 1984 (Exhibits 1A, 1B, 2A, 3A, 4A, 5A, 7A, 10A, 11A, 12A, 12C, 13A, 13B, 13C, 15A, 17A, 18A, 19A, 20A, 24A, 24B, 25A, 26A, 26B, 26C, 26D and 27A) are similar or virtually identical in gross appearance to controlled substances with corresponding identifying exhibit numbers.

14) In 1982, Midwest sold products containing combinations of all three of the following ingredients: caffeine, ephedrine and phenylpropanolamine. Those products were subsequently seized by the FDA as illegal new drugs in November, 1982. No samples of three-ingredient products were offered into evidence, but according to the testimony of FDA Inspector Nielson, the products were virtually identical in appearance to products seized in 1983 and 1984.

15) Prior to November, 1983, Midwest sold capsules and tablets containing combinations of two of the following ingredients: caffeine, ephedrine, and phenylpropanolamine. In November, 1983, Midwest and other distributors received a regulatory letter from the FDA (Exhibit OOO), stating that the products were considered illegal "new drugs" and were subject to seizure. Products containing two-ingredient combinations were seized by the FDA in November, 1983. The following exhibits are examples of those products: 1AA, 1BB, 1CC, 1DD, 2CC, 2DD, 3AA, 3BB, 4AA, 4BB, 5AA, 6AA, 6BB, 7AA, 8AA, 8BB, 9AA, 10AA, 10BB, 11AA, 11BB, 12BB, 12DD, 13DD, 13FF, 15AA, 15BB, 16AA, 17AA, 17CC, 17DD, 18AA, 19AA, 20AA, 21AA, 22AA, 22BB, 22CC, 23AA, 23BB, 24AA, 26AA, 26BB, 27AA, 29AA, 30AA, 31AA, 31BB and 32AA.

16) The double-ingredient products listed above are virtually identical in shape, size or color to single-ingredient products with corresponding identifying numbers seized in April, 1984.

17) There is no amphetamine similar in gross appearance to Exhibit 9A, a black and clear capsule; however, the product is similar to Exhibits 2 and 6 in concept. There is no amphetamine similar in gross appearance to Exhibit 16A, an oblong white tablet with blue and red specks imprinted "20/20;" however, that product is identical to a DEA evidence sample of an illegal three-ingredient tablet (Exhibit 16). There is no amphetamine similar in gross appearance to Exhibit 22A, a pink football-shaped tablet; however, that product is identical to a DEA evidence sample of an illegal two-ingredient product (Exhibit 22). There is no amphetamine similar in gross appearance to Exhibit 23A, a large pink heart-shaped tablet; however, that product is identical to a DEA evidence sample of an illegal two-ingredient product (Exhibit 23) and similar in concept to the amphetamine Benzedrine, a brown triangle (Exhibit 23). There is no amphetamine similar in gross appearance to Exhibit 28A, a small round purple double-scored tablet; however, that product is identical to a DEA evidence sample of an illegal two-ingredient tablet. There is no amphetamine similar in gross appearance to Exhibit 29A, a gray bomb-shaped tablet imprinted "block-buster;" however, that product is identical to a DEA evidence sample of an illegal two-ingredient tablet. There is no amphetamine similar in gross appearance to Exhibit 21A, a pink and white layered bullet-shaped tablet imprinted ".357 Magnum;" however, that product is identical to an illegal two-ingredient product seized from Midwest in November, 1983 (Exhibit 21AA).

18) Former Midwest customer Robert Bryan misrepresented and sold ".357 Magnum" tablets as amphetamine, even though the product does not physically resemble an amphetamine.

19) The drug products seized in April, 1984, were found in the following dosages and forms:

25 milligrams ephedrine:

small pink heart (Exhibits 24A and 24B); thin white double-scored tablets (Exhibits 26A, 26B and 26D); thin yellow double-scored tablets (Exhibit

27A); thin purple double-scored tablets (Exhibits 28A);

50 milligrams dyphenhydrate:

large orange tablet (Exhibit 25A);

75 milligrams caffeine:

white cross tablet (Exhibit 26C);

175 milligrams caffeine:

black capsule (Exhibit 1A), red capsule (Exhibit 4A,), blue capsule (Exhibit 10A), yellow capsule (Exhibit 13B);

200 milligrams caffeine:

green and clear capsule (Exhibit 2A); black and yellow capsule (Exhibit 3A); black and red capsule (Exhibit 5A); black and clear capsule (Exhibit 9A); large orange capsule (Exhibit 11A); blue and clear capsule (Exhibits 12A and 12C); yellow capsule (Exhibits 13A and 13C); oblong white tablet with green specks (Exhibit 15A); oblong white tablet with blue specks (Exhibits 17A and 17C); oblong white tablet with red specks (Exhibit 19A); pink football (Exhibit 22A); large pink heart (Exhibits 23A and 23B); round bi-convex white tablet with green specks (Exhibit 30A); round bi-convex white tablet with blue specks (Exhibit 31A);

300 milligrams caffeine:

oblong white tablet with red and blue specks (Exhibit 16A); oblong pink tablet with blue specks "20/20" (Exhibit 20A);

325 milligrams caffeine:

black capsule "MOLE" (Exhibit 1B); white capsule "MOLE" (Exhibit 7A); oblong blue tablet with blue and red specks (Exhibit 18A); ".357 Magnum" (Exhibit 21A); "block buster" (gray bomb) (Exhibit 29A).

20) The drugs seized in November, 1983, were found in the following dosages and forms:

25 milligrams ephedrine and 25 milligrams phenylpropanolamine:

small white double-scored tablet (Exhibit 26BB); small yellow double-scored tablet (Exhibit 27AA);

85 milligrams caffeine and 25 milligrams ephedrine:

small white double-scored tablet (Exhibit 26AA);

125 milligrams caffeine and 25 milligrams ephedrine:

black capsule (Exhibit 1AA); red capsule (Exhibits 4AA and 4BB); blue capsule (Exhibits 10AA and 10BB); yellow capsule (Exhibit 13DD);

225 milligrams caffeine and 25 milligrams ephedrine:

black capsule (Exhibit 1CC); green and clear capsule (Exhibit 2CC and 2DD); black and yellow capsule (Exhibit 3BB); black and red capsule (Exhibit 5AA); red and clear capsule (Exhibit 6BB); black and clear capsule (Exhibit 9AA); orange capsule (Exhibits 11AA and 11BB); blue and clear capsule (Exhibit 12BB); yellow capsule (Exhibit 13FF), oblong white tablet with green specks (Exhibits 15AA and 15BB); oblong white tablet with blue specks (Exhibits 17AA and 17DD); oblong white tablet with red specks "30/30" (Exhibit 19AA); pink football-shaped tablet (Exhibit 22AA); large pink heart-shaped tablet (Exhibits 23AA and 23BB); small pink heart-shaped tablet (Exhibit 24AA); white bi-convex tablet with green specks (Exhibit 30AA); white bi-convex tablet with blue specks (Exhibits 31AA and 31BB);

250 milligrams caffeine and 25 milligrams ephedrine:

blue and clear capsule (Exhibit 12DD);

300 milligrams caffeine and 25 milligrams ephedrine:

black and yellow capsule (Exhibit 3AA); oblong white tablet with red and blue specks "20/20" (Exhibit 16AA); oblong pink tablet with blue specks "20/20" (Exhibit 20AA);

325 milligrams caffeine and 25 milligrams ephedrine:

black capsule (Exhibit 1BB); oblong white tablet with red specks "30/30" (Exhibit 18AA); ".357 Magnum" (Exhibit 21AA); "Block Buster" (Exhibit 29AA);

355 milligrams caffeine and 25 milligrams ephedrine:

white "MOLE" (Exhibit 7AA).

21) Midwest markets white powdery substances and black sticky substances as incense. Fifteen pounds of the white powder were seized by the FDA in April, 1984 (Exhibits 39A, 39B and 39C). Former Midwest customer Kenneth Maschmeier purchased similar powder from Midwest in 1980 for $100.00 per ounce and resold it as cocaine for $80.00 per gram. Daniel Bengtson, another former Midwest customer, sold Midwest's white powder as cocaine.

22) Pursuant to the California Imitation Controlled Substances Act, California Food and Drug Authorities seized Midwest products including mini-white tablets and mini-pink hearts from a firm known as "Sno-Products," or "S & S Speed Merchants" in California. That firm advertised a white powdery substance called "Bolivian Flake" as incense in 1982. The advertisements contain the statements: "Passes tests like the real thing. So realistic you can't tell it from the real thing! So perfect it passes the most difficult tests. 'Fools the experts' Rock/crystal." (Exhibits 87 and 88).

23) Amphetamines are commonly referred to among street drug users as "speed." Although it may be true that the definition of that term has been broadened in recent years in some parts of the country to include any stimulant, the term "speed" denotes amphetamines to principals and employees of Midwest and to its customers.

24) Black capsules containing amphetamines are sometimes referred to among street drug users as "black mollies." Midwest markets a black capsule with the markings "M–O over L–E" (Exhibits 1B and 1BB).

25) A common clandestinely manufactured amphetamine takes the form of a small flat white tablet with double scoring (Exhibit 26). It is referred to among drug users as a "white cross," "mini-white," or "mini-bennie."

26) Midwest manufactures small flat white tablets with double scoring (Exhibits 26A, 26B and 26D). In 1984, sales of those products accounted for sixty per cent of Midwest's business.

27) Ephedrine is a bronchodilator. It is commonly used in treatment for asthma and other respiratory disorders. None of Midwest's advertisements refer to its use as a bronchodilator. It is classified in Midwest ads only as a stimulant.

28) Ephedrine is not recommended for prolonged use. One person taking ephedrine as directed would not consume one thousand capsules in a year.

29) Amphetamines in capsule form commonly contain brown beads (active ingredient) in a white powder base (inert). Some of Midwest's capsule products contain brown beads (inert) in a white powder base (active ingredient) (Exhibit 13AV).

30) Caffeine and ephedrine are similar to amphetamines in effect, though less potent.

31) Midwest did not and does not list its products in trade publications such as "Redbook: Annual Pharmacist's Reference" (Exhibit 92), nor does it advertise in the normal trade publications. Defendants are not listed in the "Redbook: Annual Pharmacist's Reference" (Exhibit 92) compendium of drug wholesalers in common use by pharmacists in the United States.

32) Several over-the-counter medications contain caffeine, ephedrine or phenylpropanolamine. Examples of such products are Caffedrine (Exhibit B), Quick Pep (Exhibit F), PEP Back (Exhibit K), and Vivarin (Exhibit I). Those products are marketed in convenient stores or drugstores in small bottles or in "blister-pack" packages containing twelve to fifty unit doses (Exhibits C, G, J and L).

33) The practice of passing off such products as controlled substances is harmful to the general public. Midwest's products have been found in the possession of junior high and high school students by Mary Frazier-Koontz, former coordinator of the school-community intervention at Lincoln East High School. Similar prod-

ucts have also been found in the possession of high school students in Maryland by undercover agent, Douglas Tressler. Additionally, Midwest's products have been found in drug raids in Illinois (Exhibit 49) and California.

34) The ingredients of the seized drugs, although safe when used properly, can be toxic when consumed in large amounts. Overdoses of caffeine and ephedrine are documented as contributing to the deaths of at least thirteen people. Caffeine and ephedrine are included in data compiled by the National Institute on Drug Abuse known as the Drug Abuse Warning Network (DAWN) Report (Exhibit RRR), which lists occurrences of drugs mentioned in hospitals and emergency rooms as overdoses.

35) There is a particular danger of young people overdosing on true amphetamines after becoming accustomed to large dosages of caffeine and ephedrine.

## DISCUSSION

### I. *Imitation*

■ The Court finds that the above facts demonstrate that the seized products are marketed by defendants as imitations of other drugs in violation of § 352(i)(2), which provides in pertinent part: "A drug or device shall be deemed to be misbranded —(i) ... (2) if it is an imitation of another drug." In turn, 21 U.S.C. § 334 provides:

> Any article of food, drug, device or cosmetic that is adulterated or misbranded when introduced into or while in interstate commerce or while held for sale (whether or not the first sale) after shipment in interstate commerce ... shall be liable to be proceeded against while in interstate commerce, or at any time thereafter, on libel of information and condemned in any district court of the United States....

The burden is upon the government to prove by a preponderance of the evidence that the drug products are "imitations." See, e.g., *United States v. An Article of Drug ... Bentex Ulcerine*, 469 F.2d 875 (5th Cir.1972), cert. denied, 412 U.S. 938, 93 S.Ct. 2772, 37 L.Ed.2d 397 (1973); and *United States v. Articles of Food and Drug Coli-Trol 80 Medicated*, 372 F.Supp. 915 (N.D.Ga.1974), aff'd, 518 F.2d 743 (5th Cir.1975). Although the phrase "imitation" is not defined in the statute, Webster's Third New International Dictionary, Unabridged (1966 Ed.) defines "imitation" as "an act or instance of imitating; an assumption of or mimicking of the form of something that serves or is regarded as a model...." The United States Supreme Court recently stated that the provisions of 21 U.S.C. § 352(i) are intended to prohibit a company from "passing an imitation off as the original...." *United States v. Generix Drug Corp.*, 460 U.S. 453, 459, n. 9, 103 S.Ct. 1298, 1302, n. 9; 75 L.Ed.2d 198 (1983).

The Federal Food, Drug and Cosmetic Act must be construed with sensitive awareness of its overall purpose to protect the lives and health of the consumer public from hazards against which the consumer has no defense. *United States v. Articles of Drug Labeled Colchicine*, 442 F.Supp. 1236, 1241 (S.D.N.Y.1978). "Indeed, whenever there is a problem of construction involving the federal food and drug law, the duty of courts is to liberally construe the provisions of the Act, being mindful of its overriding purpose to protect the lives and health of the public." *United States v. Articles of Animal Drug Containing Diethylstilbestrol*, 528 F.Supp. 202, 204–05 (D.Neb.1981). See also, *United States v. Naremco, Inc.*, 553 F.2d 1138, 1141 (8th Cir.1977).

With these principles in mind, the Court finds that the seized drugs are imitations of other drugs which are illegal to market. As noted above, most of Midwest's products look virtually the same as controlled substances. Differences in markings are of no consequence for the reason that the products do not have to be identical to be imitations; that is the distinction between counterfeit and imitation. *United States v. Articles of Drug*, 601 F.Supp. at 395–96.

Of special significance is the fact Midwest markets the same dosage (i.e., 200 milligrams) in many different sizes, colors and shapes with no reasonable explanation or justification for this variety of dosage forms. The Court concludes the dosages and forms are designed to imitate controlled substances or other illegal drug products. Additionally, the evidence shows Midwest's capsule products contain brown beads or nonpareils which lack pharmaceutical ingredients. Amphetamine capsules contain similar brown beads. Again, Midwest proffered no credible explanation for the presence of the beads. The implication is clear that the brown beads were inserted into the capsules in order to make them resemble controlled substances.

Midwest's advertisements are especially incriminating. The full-page ad for U.S.A. Drugs (Exhibit 78) shows the drugs in an "explosive" format with the caption "Explode with Energy." Although the ad contains a disclaimer, "This product does not contain amphetamines, narcotics or barbiturates," the ad does not state the ingredients of the products. Other Midwest ads also show pictures of the products but do not list any pharmaceutical ingredients (Exhibits 72, 73 and 75). Again the clear implication is that Midwest's products are being marketed on the basis of their appearance alone. Moreover, a principal ingredient of Midwest's products, ephedrine, is pharmaceutically indicated for use as a bronchodilator, but Midwest's ads market the products only as stimulants.

In addition, Midwest markets only products which are similar in effect to controlled substances. While other pharmaceutical products, both prescription and over the counter, also resemble controlled substances, there is no evidence that such products were ever "passed off" as controlled substances or other illegal drugs.

More importantly, it is clear Midwest's overall marketing scheme is designed to appeal to people's perceptions that the products are illegal. The products are advertised in various subculture magazines instead of in legitimate trade journals.

The products are marketed principally in one thousand count bottles, which are conducive to breaking down the products into smaller containers or baggies. The variety of dosage forms and the low cost per thousand units makes the products amenable to resale.

The ".357 Magnum" and "Block Buster" can be marketed as controlled substances even though they do not literally resemble any controlled substances. The products are marketed to the same target market and in the same manner as other Midwest products. The names of the products imply a powerful ingredient which would "blow you away." Because the products are ultimately aimed at a young, non-sophisticated market (testimony of Mary Frazier-Koontz), customers perceive that the .357 Magnums and Block Busters are illegal because of the manner in which they are sold (Testimony of Bryan).

In contrast, legitimate over-the-counter caffeine, ephedrine or phenylpropanolamine products are marketed only in a few forms, in small lot sizes with a relatively high price per capsule. Indeed, Mr. Bengtson testified he would not attempt to pass off such products as "Caffedrine" (Exhibit C) as an amphetamine because it would not be profitable for him to do so. Significantly, Mary Frazier-Koontz testified she never saw any over-the-counter products such as Dexatrim, Dex-a-Diet, or Caffedrine in the possession of minors at her school. Additionally, most of these products are clearly marked with the product name on the capsule.

Although any one of these factors standing alone would not necessarily be enough to lead to a conclusion that Midwest's products are imitations of controlled substances, Midwest's overall pattern of marketing and distribution is clearly designed and calculated to lead to the "passing off" of Midwest's products as controlled substances. There is simply no other reason to market a certain dosage in fifteen different colors, shapes and sizes (all of which resemble controlled substances) if not to appeal to a perception of illegality. Nei-

ther is there any reason to advertise in pornographic, biker and drug-oriented subculture magazines on the basis of appearance alone, without reference to ingredients, other than to imitate or mimic controlled substances. "Once a device is found to be misbranded, it must be condemned pursuant to 21 U.S.C. § 334(a)." *United States v. An Article of Device ... Diapulse,* 650 F.2d 908, 910 (7th Cir.1981).

Having found that Midwest's products are imitations, the court must next decide whether a substantial portion of those products were "passed off." Sixty per cent of Midwest's sales in 1984 amounted to sales of "white crosses" or "mini-whites." Evidence establishes that clandestine amphetamines are commonly sold in the same form (flat tablets, thick or thin, double-scored with a "cross"). Midwest markets its tablets in varying dosages of caffeine or ephedrine. Marketing the product in varying ingredients and dosages amounts to marketing the product on a basis of appearance alone. The product is advertised solely on the basis of its appearance. There is no apparent reason nor any evidence justifying the marketing on that basis other than to imitate a clandestine illegal drug. The circumstances of Midwest's marketing and distribution scheme lead to the conclusion that most, if not all, of its products are designed to be "passed off" as controlled substances. While the phrase "substantial" is undefined, the Court finds, in view of all the evidence that a "substantial" amount of Midwest's products are "passed off" as controlled substances.

## II. *Intent*

■ There is overwhelming evidence Midwest, at the least, had reason to anticipate its products would be "passed off" as controlled substances. The analysis of the intent issue involves assessment of the credibility of several witnesses. On one hand, Steve Sommers testified he never encouraged customers to "pass off" his products as controlled substances, did not actually know the products were being

"passed off" and had no reason to think they would be "passed off." Two of Midwest's former customers, Kenneth Maschmeier and Daniel Bengtson, testified Sommers knew of the practice, endorsed and encouraged it, and on some occasions, sold Midwest's products as controlled substances himself. Maschmeier and Bengtson are admitted drug users, have made "deals" with the government in exchange for testimony, and have animosity toward Midwest. In spite of those facts, the Court finds their testimony more credible than that of Steve Sommers. On direct examination by the government, Sommers was evasive and generally responded either that he didn't know or could not recall answers to the questions of counsel for the government. On cross-examination by his own counsel, his memory seemed suddenly revived. On balance, and considering his substantial interest in the outcome of this litigation, the Court finds his testimony not credible.

In view of the evidence set forth above regarding Midwest's marketing practices, it is simply impossible to believe Midwest, through its principals, did not know nor anticipate the practice of "passing off" its products. It is clear the overall marketing scheme was intended to facilitate that practice.

Midwest's prior history also contributes to the conclusion it should have reasonably anticipated its products would be "passed off." Midwest moved from Council Bluffs, Iowa, to Omaha, Nebraska, and back at the same time as statutes outlawing the sale of imitation controlled substances were passed in Iowa and Nebraska, respectively. Midwest maintained continuity of product appearance and marketing methods after seizures of three-ingredient products in 1982 and two-ingredient products in 1983.

Additionally, several prior practices on the part of Midwest evidence an intent to "pass off." Inert brown beads, similar in appearance to those in actual amphetamines, were present in Midwest's capsules. Midwest previously marketed yellow capsules with markings "RUS," "RJS"

and "RU8". Those markings are deceptively similar to the markings on actual amphetamines manufactured by R.J. Strasenburgh Company (i.e., Exhibit 5P).

Midwest also marketed white powder incense[1] for $100 per ounce. Advertisements for a similar white powder seized by authorities in California show it was "passed off" as the "real thing." Logic and common sense dictate the "real thing" has reference to cocaine, if for no other reason than that it is unreasonable to expect consumers would pay $100 per ounce for incense. In addition, testimony of Daniel Bengtson and Ken Maschmeier demonstrates Midwest's white powder, referred to as "cut," was passed off as cocaine.

In addition, tablets bearing the imprint "ROROR" and "714" were seized by the FDA in November, 1983 (Exhibit 32AA). The tablets were deceptively similar to a controlled substance (Exhibit 32) imprinted "RORER" and "714", commonly known as "Quaalude." Although Midwest may not have been marketing those products in 1984, evidence of their prior acts is relevant to show the extent of Midwest's knowledge regarding the illicit drug trade.

### III. *Propriety of Injunctive Relief*

■ This Court has statutory authority to grant injunctive relief. Title 21, U.S.C. § 332(a) provides:

The district courts of the United States and the United States courts of the Territories shall have jurisdiction, for cause shown ... to restrain violations of § 331 of this title....

The government has shown a violation of 21 U.S.C. § 331(b) which provides: "The following acts and the causing thereof are prohibited: * * * (b) the adulteration or misbranding of any food, drug, device or

cosmetic in interstate commerce." As noted, a drug is deemed misbranded if an imitation of another drug. 21 U.S.C. § 352(i)(2).

Where an injunction is authorized by statute, it is proper to issue such an order to restrain violations of the law if the statutory conditions are satisfied. *Federal Trade Comm'n v. Rhodes Pharmacal Co.*, 191 F.2d 744, 747 (7th Cir. 1951), reversed on other grounds, 348 U.S. 940, 75 S.Ct. 361, 99 L.Ed. 736 (1955). Furthermore, in such situations, the court is not bound by the principles that apply in private equity suits. *United States v. Diapulse Corporation of America*, 457 F.2d 25, 27–29 (2nd Cir. 1972); *Mitchell v. DeMario Jewelry, Inc.*, 361 U.S. 288, 291, 80 S.Ct. 332, [334–35] 4 L.Ed.2d 323 (1960). Proof of irreparable harm from denial of an injunction, a traditional prerequisite for injunctive relief, need not be established where the government seeks by statutory injunction to protect the public health and effectuate Congressional policy, *Diapulse Corporation, supra,* 457 F.2d at 28, for the availability of the statutory power to enjoin violations of the statute is evidence of a Congressional judgment that such violations would cause irreparable injury. *Ibid; see also United States v. Nutrition Services,* 227 F.Supp. 375. 388–89 (W.D.Pa.1964), aff'd 347 F.2d 233 (3rd Cir.1965). Likewise, the government is not bound to prove the absence of an adequate remedy at law where a statute authorizes an injunction. *Bowles v. Huff,* 146 F.2d 428, 430 (9th Cir.1944).

The purpose of an injunction is to restrain defendants' further violations of the law. *United States v. W.T. Grant,* 345 U.S. 629, 633, 73 S.Ct. 894, [898] 97

---

1. Midwest has objected to any reference to the powder asserting that it is not a "drug product" under 21 U.S.C. § 321. Midwest contends it was not notified of evidence regarding the chemical composition of the powder. In that regard, the Court finds that classification as a "drug" pursuant to 21 U.S.C. § 321(g)(1)(C) is dependent upon intent of the manufacturer/distributor that it be used as a drug, without reference to actual contents. *United States v. Storage Spaces Designated Nos. 8 and 49,* 777 F.2d 1363, 1366 (9th Cir.1985); *National Nutritional Foods Ass'n v. Mathews,* 557 F.2d 325, 334–35 (2d Cir. 1977). Documentary evidence regarding the chemical composition of the white powder is thus irrelevant since the evidence set out infra shows the distributors intended the product to be used for human consumption.

L.Ed. 1303 (1953); *United States v. Richberg*, 398 F.2d 523, 531 (5th Cir.1968). In exercising its discretion, a court may, and should, "... consider the past as a key for the future." *Bowles v. Lentin*, 151 F.2d 615, 620 (7th Cir.1945); *United States v. Richberg, supra*, at 531. The requirements for injunctive relief are met when the government establishes that defendants have violated the statute and there exists "some cognizable danger of recurrent violation ..." *United States v. W.T. Grant, supra*, 345 U.S. at 633, 73 S.Ct. at 898. Once the government establishes the existence of the statutory violation, the burden shifts to the defendants to show that " 'there is no reasonable expectation that the wrong will be repeated'." *Ibid.*

*United States v. Sene X Eleemosynary Corp., Inc.*, 479 F.Supp. 970, 980–81 (S.D. Fla.1979). See also *Morris County Trust for Historic Preservation v. Pierce*, 714 F.2d 271 (3d Cir.1983).

In accordance with the above-stated principles, the Court finds defendants should be enjoined from further engaging in the marketing or sale of all products similar in form, size or color to those seized in April, 1984. As noted, the evidence establishes the defendants have violated the Food and Drug laws. Although not required to show irreparable harm, the government has presented substantial evidence of the harmful effects of Midwest's continued marketing.

Midwest, on the other hand, has not shown there is any reasonable expectation the wrong will not be repeated. In fact, the opposite is true. Midwest's history shows repeated disregard for the Food and Drug laws. The facts set forth, infra, indicate a willingness on the part of Midwest to close its eyes to the reality of distribution of its drugs and to rely on technical defenses to avoid the consumer protection goals of the Food and Drug Act. "The matter [issuance of injunction] is in the broadest sense for the discretion of the trial court which is best qualified to form a judgment as to the likelihood of a repetition

of the offense." *United States v. Article of Drug Designated B–Complex Cholinos Capsules*, 362 F.2d 923 928 (3d Cir.1966).

An injunction may be framed to bar future violations that are likely to occur. *United States v. An Article of Drug*, 661 F.2d 742, 747 (9th Cir.1981). "An injunction may sweep broadly in its prohibition if that is necessary to enjoin future violations...." *United States v. Diapulse Corporation*, 457 F.2d at 29. The Court's discretion is only limited to the extent that it cannot enjoin conduct about which there has been no complaint. *United States v. Spectro Foods Corp.*, 544 F.2d 1175, 1180 (3d Cir.1976).

The government seeks a broad prohibition against Midwest's marketing of pharmaceutical products. The government seeks an order banning Midwest from marketing any drug product without prior consent of the Food and Drug Administration. The Court finds this request too broad. "An injunction must be complete and sufficiently specific in itself to instruct an enjoined party as to what acts are prohibited." *United States v. Articles of Drug Designated B–Complex Cholinos Capsules*, 362 F.2d at 927. Accordingly, Midwest will be enjoined from selling or marketing in any way any tablet, capsule or substance which is similar in appearance and effect to any substance seized by the FDA in April, 1984. Midwest is further enjoined from employing marketing techniques to sell its products, which provide a certain dosage in numerous forms, or advertising solely on the basis of appearance of the product or any combination of these practices.

## IV. *Defendant's Contentions*

■ Midwest contends that 21 U.S.C. § 352(i)(2) is unconstitutional as applied to it. As noted, this Court previously held the statute is not unconstitutionally vague. *United States v. Articles of Drug*, 601 F.2d at 397. This Court noted "[t]he production and marketing of drugs is a highly regulated industry. In the field of regulatory statutes governing limited business

activities, a greater leeway is allowed in sustaining a statute against a vagueness attack" and further noted "[t]he cry of vagueness is without substance...." Cases now cited to the Court in support of defendant's contentions are inapposite for the reason that none deal with a highly regulated industry.

Midwest's contention the statute is unconstitutional as applied to it implies not vagueness or facial invalidity but denial of either due process or equal protection of the law. Midwest has made no showing, either in its brief or through evidence presented at trial, that it was denied due process or equal protection.

With regard to the equal protection issue, Midwest has proffered the unreported decision in *Gemini v. Heckler*, No. 83–CV–5157 (S.D.N.Y. Nov. 1, 1984) (Exhibit Q), for the apparent proposition that because the court therein held Gemini Pharmaceuticals had stated a claim for denial of equal protection with regard to seizures of its double ingredient drugs, Midwest has been similarly denied equal protection herein. Such is not the case. There has been no showing the government has enforced § 352(i)(2) any differently as to Midwest than to other violators.

Midwest also asserts that application of the statute to Midwest was somehow unconstitutional because Midwest had not been advised of the possibility of seizure by way of a regulatory letter. On prior occasions in 1981 and 1983, when the FDA had seized drugs in Midwest's inventory, a regulatory letter indicating the products were regarded as "new drugs" under § 201(p) of the Act preceded the seizure. However, the November, 1983 letter (Exhibit OOO) contained the statement: "[b]ecause the products that are the subject of this letter have, in some instances, been marketed and promoted as products capable of producing effects similar to those produced by certain substances subject to the Controlled Substances Act and are widely misused and abused, the agency is changing its enforcement policy with respect to the products described." Surely Midwest was on notice

that continued marketing of drug products in forms and in a manner conducive to their being "passed off" as controlled substances was not in conformity with the letter and spirit of the Food and Drug Act.

Midwest also argues that a product cannot be treated as contraband, subject to seizure and condemnation and the sale of the product cannot be enjoined if the product is capable of a lawful use. Midwest cites *Sony Corporation v. Universal City Studios, Inc.*, 464 U.S. 417, 435, 104 S.Ct. 774, 785, 78 L.Ed.2d 574 (1984), in support of that proposition.

Although this Court cited Sony in support of its holding regarding extended or contributory liability, *United States v. Articles of Drug*, 601 F.2d at 394, the specific holding of the Sony case regarding the issue of seizure and condemnation is limited to cases involving copyright infringement. The present case is distinguishable from a copyright infringement case for the reason that copyright infringement laws, which essentially involve a grant of statutory monopoly, are designed to be narrow in scope and of limited duration. In contrast, the scope of the Food and Drug Act is broad in order to protect the lives and health of the public. *Compare Sony*, 464 U.S. 431–32, 104 S.Ct. 783–84, with *United States v. Naremco*, 553 F.2d at 1141.

Moreover, it is clear that products capable of lawful uses can be seized as contraband and their sale enjoined. For example, many states have passed statutes barring sales of drug paraphernalia. Those statutes have been upheld as constitutional. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). In *The Town Tobaccanist v. Kimmelman*, 94 N.J. 85, 462 A.2d 573, 578 (1983), a case involving a drug paraphernalia statute, the New Jersey Supreme Court dealt with the issue of "... the asserted difficulty in distinguishing with sufficient clarity the sale of the same article, a pipe, for instance, by two different merchants—and making one sale criminal and the other not." The Court held, "[g]enerally speaking, it is both

legally permissible and, through careful drafting, entirely feasible to criminalize this kind of conduct only where the actor intends that the goods be used in connection with the illegal use of drugs or knows that it is highly probable that they will be so used." Id. Similarly, Midwest's knowledge of the high probability that its products will be passed off as controlled substances renders the products violative of Section 352(i)(2). The New Jersey Supreme Court also stated:

> * * * The fact that the act allows some merchants to sell items while other merchants may not is not a problem. It is simply one of the many examples in the criminal law where the actor's intention or knowledge renders otherwise innocent conduct criminal. Similarly, the fact that the act may, in putting some merchants out of business, simply cause customers to go elsewhere for drug paraphernalia, is not a legal problem. That a particular criminal sanction may not effectively eliminate the conduct sought to be prohibited does not render it invalid.

Id. at 579 n. 3.

In language relevant to the situation herein, the New Jersey Supreme Court stated:

> * * * A "headshop" owner who sets up a store in an attempt to attract those who illegally use controlled, dangerous substances cannot be heard to complain that the law is vague because it is possible that a tobacco smoker may buy one of his pipes, if the fact is that his entire operation makes it practically certain that the buyer will buy the pipe to smoke marijuana. What his complaint amounts to is not that the law will allow an accidental purchase to inculpate him, but rather that it will not allow an accidental purchase to exculpate him.

Id. at 591. See also, *Casbah, Inc. v. Thone*, 651 F.2d 551, 561 (8th Cir.1981), cert. denied, 455 U.S. 1005, 102 S.Ct. 1642, 71 L.Ed.2d 874, reh. denied, 456 U.S. 950, 102 S.Ct. 2023, 72 L.Ed.2d 476 (1982) (upholding validity of Nebraska Drug Paraphernalia statute).

Midwest's arguments in opposition to condemnation and injunction are without merit.

Accordingly, a separate order condemning the products seized from Midwest on April 4, 1984, and enjoining Midwest from future sales or marketing in any way of similar products will be entered this date.