**UNITED STATES of America,**
**Appellee,**

v.

**GUARDIAN CHEMICAL CORPORA-**
**TION and Alfred E. Globus,**
**Appellants.**

**Nos. 368, 369, Dockets 32789, 32790.**

United States Court of Appeals
Second Circuit.

Argued March 5, 1969.

Decided April 15, 1969.

**158**

City, Joel E. Hoffman, Peter J. Hoagland, Wald, Harkrader & Rockefeller, Washington, D. C., on the brief), for appellants.

Robert Kraft, Asst. U. S. Atty., Brooklyn, N. Y. (Vincent T. McCarthy, U. S. Atty., Jerome C. Ditore, Asst. U. S. Atty., Brooklyn, N. Y., Joanne S. Sisk, Atty., Dept. of Health, Education and Welfare, Washington, D. C., on the brief), for appellee.

Before LUMBARD, Chief Judge, SMITH, Circuit Judge, and McLEAN, District Judge.*

McLEAN, District Judge:

On October 20, 1965, a two-count information was filed in the United States District Court for the Eastern District of New York against defendants. The first count charged them with introducing a new drug into interstate commerce on November 14, 1962 without first having obtained approval of an application required for new drugs by 21 U.S.C. § 355(b). The second count charged them with introducing into interstate commerce on November 14, 1962 a drug which was misbranded within the meaning of 21 U.S.C. §§ 352(e) (2), 352(f) (1) and 353(b) (4). After a trial before Judge Dooling and a jury in May 1968, the jury returned a verdict of not guilty on Count 1 as to both defendants, and of guilty on Count 2 as to both. Each defendant was sentenced to pay a fine of $1,000. Imposition of a prison sentence as to defendant Globus was suspended and he was placed on probation for five years.

Defendants maintain that the evidence was insufficient to warrant conviction on Count 2 and that the court should have directed a verdict of acquittal. Defendants also complain of the court's charge and of the prosecutor's summation. Our study of the record convinces us that these points are not well taken. Accordingly, we affirm the judgment.

The same shipment formed the basis of each count. On November 14, 1962,

Selma M. Levine, Washington, D. C. (Benjamin Wm. Mehlman, New York

* Of the Southern District of New York, sitting by designation.

defendants shipped from Long Island City, New York, to Holzer Hospital, Gallipolis, Ohio, bottles containing a product bearing the trade name Renacidin. It was manufactured by defendant Guardian Chemical Corporation, of which defendant Globus is chairman, president and treasurer.

The history of this product has an important bearing upon the issues presented for decision here. The facts in this respect were not disputed at the trial. They may be briefly summarized as follows.

Guardian Chemical Corporation (Guardian) first manufactured the product in 1955 or thereabouts. Guardian did not call it Renacidin at that time. Guardian sold it in liquid form for use in cleansing pipes and tubes which carry milk in pasteurizing and milking apparatus. The liquid acted to dissolve deposits which clogged the tubes.

In 1957 a Cincinnati urologist, Dr. Mulvaney, suggested to Globus that the product would be useful in dissolving calcium deposits which tend to plug catheters. Globus thought well of this suggestion. He decided to call the liquid Renacidin and to market it for cleansing catheters which had been removed from the human body. He had no thought at that time of using it to treat bodily conditions themselves.

In 1957 Dr. Mulvaney, at an American Urological Association meeting which Globus attended, described his technique in using Renacidin to irrigate catheters while they were still inserted in the human body ("in-dwelling" catheters) and in treating kidney stones. Subsequently in 1959, Dr. Mulvaney published an article on the subject. Other urologists began to use Renacidin in the treatment of kidney stones, and bladder stones as well, and other articles appeared.

In 1960 Globus prepared a brochure entitled "Renacidin—Solvent for Many Types of Urinary Calcifications." It described at some length the advantages of Renacidin in the treatment of bladder and kidney stones. Guardian distributed this brochure to the medical profession in 1961.

Also in 1961 or early in 1962, Globus prepared another brochure in somewhat more abbreviated form. This recommended Renacidin for preventing the formation of bladder stones "by dissolving stone-forming nuclei." Guardian sent this brochure to urologists.

Finally, prior to October 1962, Globus prepared a rather extensive article on Renacidin elaborating upon its beneficial properties in preventing the formation of obstructions in the urinary tract and in dissolving them. Guardian distributed this brochure at a convention of the American Medical Association in Los Angeles in November 1962.

Beginning no later than 1959, Guardian began selling Renacidin to doctors, hospitals and pharmaceutical jobbers. By the time Globus wrote his article in 1962, Guardian had sold more than 100,000 quarts (30,000 to 40,000 bottles) to such purchasers. From the beginning of the marketing of Renacidin, the label on the bottle was unchanged. The label on the bottles shipped on November 14, 1962 with which we are concerned in this case was no different from the one which Guardian used in 1957. It described Renacidin as:

"Especially Manufactured for Removing Calcium Deposits in Rubber and Plastic Catheters and Tubing."

It made no mention of the use of the product to cleanse catheters while they were still inserted in the body or to its use in treating bladder or kidney stones.

The particular shipment in question here was made on November 14, 1962 to fill an order from Holzer Hospital. There was no evidence that the hospital informed defendants before it ordered the Renacidin as to the use to which the hospital intended to put it. The parties stipulated, however, that if Mossman, the hospital pharmacist who ordered it, were called, he would testify that he ordered the Renacidin for use by the hospital's urologist for irrigating in-dwelling catheters and for dissolving kidney stones in

the human body. It was also stipulated that at some time between November 14, 1962 and January 7, 1963, defendants sent to Mossman, at his request, copies of the two brochures heretofore mentioned which recommended the use of Renacidin for these purposes.

We turn now to the rather complex provisions of the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq., which govern this case. They are quoted in the margin. 21 U.S.C. § 331(a) prohibits the introduction into interstate commerce of any drug that is misbranded. In essence, a "drug" is an article intended for use in the treatment of disease in man.[1] A drug is misbranded unless certain information appears on its "label" or on its "labeling." These two words are not synonymous. "Label" is defined in Section 321(k), in substance, as printed matter upon the immediate container of an article. "Labeling" includes not only "labels" but also printed matter "accompanying such article."

The data which the label or the labeling must contain is prescribed by Sections 352 and 353 of the Act. The subsections of Sections 352 and 353 which are relevant here are 352(e), 352(f) and 353(b).[2] In substance, their requirements amount to this. The "label" of the drug must bear the common name of each active ingredient. If the drug is not one which for safety's sake should be administered only by a physician, its "labeling" must bear adequate directions for its use. On the other hand, if it is one which only a physician should administer, its "label" must bear the words "Caution: Federal law prohibits dispensing without prescription."

■ Another refinement must be noted. In order to "accompany" an article and thus constitute "labeling" for it, printed pamphlets or brochures need

---

1. The definition of "drug" contained in 21 U.S.C. § 321(g) as it read on November 14, 1962 is:

    "The term 'drug' means (1) articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; and (2) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (3) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (4) articles intended for use as a component of any article specified in clause (1), (2), or (3) of this paragraph; but does not include devices or their components, parts, or accessories."

2. As they read on November 14, 1962, the relevant statutory provisions, as far as pertinent here, were as follows:

    "§ 352. A drug * * * shall be deemed to be misbranded—

    * * * * *

    (e) If it is a drug and is not designated solely by a name recognized in an official compendium unless its label bears (1) the common or usual name of the drug, if such there be; and (2), in case it is fabricated from two or more ingredients, the common or usual name of each active ingredient * *.

    (f) Unless its labeling bears (1) adequate directions for use; * * * Provided, That where any requirement of clause (1) of this subsection, as applied to any drug or device, is not necessary for the protection of the public health, the Secretary shall promulgate regulations exempting such drug or device from such requirement."

    "§ 353(b) (1). A drug intended for use by man which—

    * * * * *

    (B) because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by law to administer such drug; * * *."

    "§ 353(b) (4). A drug which is subject to paragraph (1) of this subsection shall be deemed to be misbranded if at any time prior to dispensing its label fails to bear the statement 'Caution: Federal law prohibits dispensing without prescription'. * * *"

    Regulations promulgated by the Secretary under the Act (21 C.F.R. § 1.106 (b)) exempt from the requirement of Section 352(f) (1) that the labeling set forth adequate directions for use a drug which comes within Section 353(b) (1), i. e., a prescription drug, provided that its label bears the cautionary legend quoted above.

not be shipped along with the article. They may be sent out either before or after the article and still "accompany" it, as long as the distribution of the drug and the brochures are parts of an "integrated distribution program." Kordel v. United States, 335 U.S. 345, 69 S.Ct. 106, 93 L.Ed. 52 (1948); United States v. Urbuteit, 335 U.S. 355, 69 S.Ct. 112, 93 L.Ed. 61 (1948); Cf. United States v. 24 Bottles "Sterling Vinegar & Honey, etc.," 338 F.2d 157 (2d Cir. 1964).

▪ How do all these rules apply to this case? As far as the question of what constituted the "labeling" is concerned, the jury could find on the evidence that at least the two brochures which defendants sent to doctors both before and after November 14, 1962, were distributed by defendants as part of an integrated program which included the sale and distribution of the Renacidin. Consequently, assuming for the moment that Renacidin is indeed a drug, the brochures constituted its labeling. The information, or lack of it, in the brochures could therefore be properly considered in determining whether or not the product was misbranded.

There is more doubt about Globus' longer article which defendants handed out at the American Medical Association convention in November 1962. It seems to stretch the meaning of words beyond the limit of elasticity to say that this dissertation "accompanied" the Renacidin. In our view, however, it makes no difference whether or not this article is considered labeling. If it was not, it was immaterial, as far as the question of misbranding goes. If it was, it did not affect the result one way or the other. Despite its length, the article added little to the previous brochures on any point relevant to the misbranding issue, or at least the jury could have so found.

Still on the assumption that Renacidin is a drug, we turn briefly to the evidence

bearing upon whether it was misbranded. Under Section 352(e) we are to look only to the "label" which must state "the common or usual name of each active ingredient." There may be some question as to whether the Renacidin label failed to comply with this requirement. It did, at least, make some attempt to do so. It bore a heading "Active Ingredient," after which the following words appeared:

> "Edible, multivalent organic acids selected from the group: gluconic, citric, malic, and acid salts of same * * *. 65% (Buffered to a pH of approx. 4.0 in a 10% solution.)"

▪ It is unnecessary, however, to dwell on this point. The government was called upon to prove only that one of the misbranding sections had been violated, not all three. The evidence was clearly sufficient to establish that at least one of the other two had not been complied with. If Renacidin could safely be administered only with a doctor's prescription, then under Section 353(b)(4) its label had to bear the statutory "Caution." Concededly it did not. If, on the other hand, Renacidin was not something which could be dispensed only by a physician, then under Section 352(f) its labeling, i. e., its label and the "accompanying" brochures, were required to state adequate directions for use.[3] There was testimony from which the jury could find that the labeling did not contain such directions, even if the word "labeling" were broadened to include the long article as well as the brochures. Hence, under either alternative, the jury was justified in finding that at least one statutory requirement was not observed.

▪ We have thus far discussed the evidence on the assumption that Renacidin is a drug, and necessarily so, for if it is not, that is an end of the case and all other issues are unimportant. We have not the slightest doubt, however, that it is. Judge Dooling submitted the

---

3. "Adequate directions for use" is defined in 21 C.F.R. § 1.106(a) as "directions under which the layman can use a drug or device safely and for the purposes for which it is intended * * *."

issue to the jury, as doubtless he was required to do. Presumably the jury found Renacidin to be a drug. There was abundant evidence to sustain that finding.

On this appeal defendants do not deny that Renacidin is a drug. Their argument is that it has both a drug and a non-drug use. It may be employed to dissolve bladder and kidney stones, or it may be used to clean tubing outside the human body. Defendants claim that there was no evidence to show a specific intent on the part of defendants that the particular bottles of Renacidin shipped to Holzer Hospital on November 14, 1962 were to be used for drug purposes. Consequently, defendants argue, the district court should have directed an acquittal. In any event, they say, the court failed to instruct the jury properly on this point.

■ In our view, the statute does not require proof of any such specific intent. Moreover, there was sufficient evidence here to support a finding, if one were necessary, that such an intent existed in this instance.

21 U.S.C. § 331 provides:

"The following acts and the causing thereof are prohibited:

(a) The introduction * * * into interstate commerce of any * * * drug * * * that is * * * misbranded."

There was enough evidence here to justify the jury in finding that (1) Renacidin is a drug; (2) defendants introduced a quantity of it into interstate commerce on November 14, 1962; (3) that quantity was misbranded for lack of the information on its label or labeling required by at least one of the sections of the statute alleged in the information. That is all that was needed to make out a violation of Section 331(a). Awareness of wrongdoing on the part of defendants need not be proved. United States v. Dotterweich, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943); see also United States v. Balint, 258 U.S.

250, 42 S.Ct. 301, 66 L.Ed. 604 (1922); United States v. Wiesenfeld Warehouse Co., 376 U.S. 86, 84 S.Ct. 559, 11 L.Ed. 2d 536 (1964).

The Supreme Court explained the reason for the rule in United States v. Dotterweich, 320 U.S. at 284–285, 64 S.Ct. at 138:

"Hardship there doubtless may be under a statute which thus penalizes the transaction though consciousness of wrongdoing be totally wanting. Balancing relative hardships, Congress has preferred to place it upon those who have at least the opportunity of informing themselves of the existence of conditions imposed for the protection of consumers before sharing in illicit commerce, rather than to throw the hazard on the innocent public who are wholly helpless."

It therefore makes no difference whether or not the defendants knew or intended that this particular shipment was to be used by the buyer for drug purposes.

In any event, even if intent were a necessary element of the crime, there was evidence of it here. This is not a case of a purchaser who, on some impulse of his own which no seller could reasonably have anticipated, uses as a drug something which was not sold for any such purpose. It is not a case, for example, of a buyer who inexplicably drinks a quart of motor oil. The evidence here was overwhelming that by 1962 defendants knew that Renacidin could be used in the human body. They recommended it for that use in their brochures. They intended and expected that it be so used and they sold it for such use. Their customers were primarily doctors and hospitals. It can fairly be said that by 1962 the drug use of Renacidin had become its normal use, not the exceptional one. There was no evidence to suggest that Holzer Hospital had any other purpose in mind when it ordered the bottles which were shipped on November 14. Under the circumstances, the jury was justified in believing that defendants in-

tended this particular shipment to be used for that purpose.

As far as the court's charge is concerned, Judge Dooling explained to the jury that one of the necessary elements of the offense of misbranding is that the product misbranded be a drug. He defined that term for the jury and told it that the burden was on the government to prove beyond a reasonable doubt that Renacidin was introduced into interstate commerce as a drug. He submitted that question to the jury for its determination. Viewing the charge as a whole, we believe that it adequately covered the point and that defendants were not entitled to anything more.

Defendants' final contention relates to certain remarks of the prosecutor upon summation which reflected upon defendants' good faith. Defendants' counsel objected to the prosecutor's comments "with respect to the trickery and deceit," asked for corrective instructions, and moved for a mistrial. After telling the prosecutor that he had gone "far too far," the court addressed the jury on the subject. The court said:

"On the second count, the charge is misbranding and three specific points are brought to your attention, and none of them involves any fraud. There is, in this case, no evidence of fraud or trickery or irresponsible procedure or misleadings or bad faith on the part of Mr. Globus or any of the medical practitioners whose work with Renacidin has been referred to in the record. Those are matters that are not involved in this case."

Defendants' counsel withdrew his motion for a mistrial.

We believe that the court's instructions were sufficient to dispel any erroneous impression that the prosecutor may have given to the jury as to the issues which it was called upon to decide. In any case, having withdrawn their objection, defendants are in no position to raise the question in this court.

The judgment is affirmed.