825 F.2d 1238
 8 Fed.R.Serv.3d 656
 UNITED STATES of America, Appellee,
v.
ARTICLES OF DRUG, et al.,
Midwest Pharmaceuticals, Inc., Appellant.
UNITED STATES of America, Appellee,
v.
MIDWEST PHARMACEUTICALS, INC., a/k/a B & S Distributors,
Robert S. Liebert, and Steven F. Sommers, Appellants.
 No. 86-1438.
 United States Court of Appeals,
Eighth Circuit.
 Submitted July 22, 1986.
Decided Aug. 4, 1987.
 
 John M. O'Connor, New York City, for appellant.
 Paul J. Johns, Omaha, Neb., and Robert Spiller, Jr., Rockville, Md., for appellee.
 Before McMILLIAN, Circuit Judge, BRIGHT, Senior Circuit Judge, and BOWMAN, Circuit Judge.
 McMILLIAN, Circuit Judge.
 
 
 1
 Midwest Pharmaceuticals, Inc., Steven F. Sommers and Robert S. Leibert (collectively referred to as Midwest) appeal from a final judgment entered in the District Court for the District of Nebraska condemning as "misbranded" certain drug products seized from Midwest in April 1984. The district court held that the Midwest drugs were imitations of other drugs in violation of 21 U.S.C. Secs. 331(b), 352(i)(2)[1] and enjoined Midwest under 21 U.S.C. Sec. 332(a)[2] from selling or marketing any drug product similar in appearance and in effect to drugs seized in April 1984 by the Food and Drug Administration (FDA or the government). United States v. Articles of Drugs, 633 F.Supp. 316 (D.Neb.1986) (Articles II ).
 
 
 2
 For reversal, Midwest argues that (1) 21 U.S.C. Sec. 352(i)(2) is unconstitutional because the term "imitation" is vague, (2) the district court applied the wrong standard in determining Midwest's liability for the alleged "passing off" of its drugs, (3) the government failed to prove that a "substantial" amount of each of the seized drugs had been passed off, (4) the injunction is overly broad and lacks specificity, (5) the district court's pretrial orders and erroneous trial rulings, taken as a whole, deprived Midwest of due process, and (6) the district court erred in dismissing Midwest's counterclaim. For the reasons discussed below, we affirm in part, reverse in part and remand for further proceedings consistent with this opinion.
 
 BACKGROUND
 
 3
 Midwest, an Iowa corporation,[3] does business as Midwest Pharmaceuticals, B & S Distributors and U.S.A. Drugs. Appellant Sommers was president of Midwest at the time of trial and had been president since January 1984. Appellant Liebert was the former president. Since January 1, 1984, Sommers and members of his household have been the sole stockholders and owners of Midwest. Sommers has no formal training in pharmacy or pharmacology.
 
 
 4
 Midwest is both a wholesale and retail distributor of generic, over-the-counter drug products containing caffeine, ephedrine (a bronchial dilator commonly used in the treatment of asthma), and phenylpropanolamine. Midwest also sells powdery and sticky substances, which Midwest markets as "incense."
 
 
 5
 Midwest buys 98 percent of its drug products from Gemini Pharmaceuticals in New York, and, in turn, usually sells its products in bulk containers of 1,000 dosage units (caplets or tablets).[4] The drugs are shipped by mail in response to mail or telephone orders and payment is usually C.O.D. According to the government, Midwest sold over 245 million dosage units during 1984. Midwest presented evidence that in 1984 it had 35,000 customers, and in 1986 it had over 60,000 customers. Midwest advertises its drug products in print media that the government characterizes as "subculture," "porno," "drug," and "biker" magazines, such as Stag, subtitled Hard Core For '84; Triple Porn Review; Partner, subtitled King of the Skin Mags; High Times; and Hustler. Midwest in advertisements describes its drug products as "legal body stimulants" and "sleep aids." The advertisements contain pictures or photographs of the drugs, but contain no information about the ingredients or indications or contraindications, and describe the drug products by names such as "357 Magnum," "20/20," "30/30," "White Mole," "Mini-White" and "Incense." Some of these names are "street names" for various illegal drugs. Midwest does not list its products in trade publications, nor is Midwest listed in the directory of wholesale drug dealers, which is used by many pharmacists in the United States.
 
 
 6
 On April 5, 1984, the FDA seized approximately 15 tons of drug products from Midwest. Of the 40 different types of products seized, most were single ingredient drug products containing caffeine. The drugs, however, differed in dosage, size and color. The FDA also seized 15 pounds of white powder that Midwest marketed as "incense."
 
 
 7
 On the day of the seizure, the FDA filed a complaint alleging that Midwest drug products were "misbranded" because they were "imitations" of other drugs in violation of 21 U.S.C. Sec. 352(i)(2) and were thus subject to in rem seizure under 21 U.S.C. Sec. 334. The FDA also sought an order enjoining Midwest and its president, Sommers, under 21 U.S.C. Sec. 332(a), from selling or marketing the same or similar products in the future. Midwest filed a claim for the return of the seized drug products, an answer, and a counterclaim, alleging harassment, abuse of process and negligence on the part of the FDA. The two actions were consolidated on August 21, 1984, for pretrial discovery and trial.
 
 
 8
 The government moved to dismiss the counterclaim on the ground that the seizure was a discretionary function and thus the FDA was exempt from liability under the Federal Tort Claims Act (FTCA), 28 U.S.C. Sec. 2680(a). Midwest sought summary judgment in both actions, alleging that 21 U.S.C. Sec. 352(i)(2) (which had been in effect since 1938) was unconstitutionally vague. Midwest also argued that the term "imitation" in 28 U.S.C. Sec. 352(i)(2) means "counterfeit" and that the drugs seized were not counterfeit because of the difference in markings.
 
 
 9
 The case was referred to a magistrate for findings and recommendations. The magistrate recommended that Midwest's motion for summary judgment be denied because 21 U.S.C. Sec. 352(i)(2) is not unconstitutionally vague and the term "imitation" is not equivalent to "counterfeit" for purposes of this provision. The magistrate concluded that "imitation" referred to the practice of passing off one substance as another, while "counterfeit" refers to the practice of using another's identifying mark without the permission of the other person or entity.
 
 
 10
 The district court rejected Midwest's objections to the magistrate's report and held that manufacturers and distributors may be held contributorily liable for alleged violations of 21 U.S.C. Sec. 352(i)(2) if they intentionally induce another to commit violations of Sec. 352(i)(2) or if they knew or reasonably could have anticipated that a substantial portion of their products would be passed off as controlled substances in the chain of distribution. United States v. Articles of Drugs, 601 F.Supp. 392, 397-98 (D.Neb.1984) (Articles I ). The district court denied Midwest's motion for summary judgment and granted the FDA's motion to dismiss the counterclaim. Id.
 
 
 11
 The case was tried in February 1986. The government sought to show that Midwest intentionally induced its customers to pass off its drug products as controlled substances to others or knew or had reason to know that its customers were passing off the drug products as controlled substances to others. The government introduced evidence that Midwest's drug products were purchased in bulk, then repackaged without any information about the ingredients, and sold as "real drugs" to "youthful and unsophisticated" junior high and high school students at "real drug" prices. Midwest "dealers" thus realized a tremendous profit, approximately 20 times the actual cost of the drugs.
 
 
 12
 Ken Maschmeier, a former Midwest customer and government witness, testified that in 1980, Sommers and Liebert encouraged him to sell Midwest's drugs by passing them off as controlled substances. Maschmeier further testified that he purchased a white powdery substance from Midwest in 1984 for $100 per ounce and resold it as cocaine for $80 per gram. Daniel Bengtson, another Midwest customer, testified that he also sold the white powder, that he had purchased from Midwest, as cocaine. Bengtson stated that he told Sommers and Liebert that he had misrepresented and sold Midwest drug products as controlled substances.
 
 
 13
 The government also presented evidence that Midwest markets only drug products that are similar in appearance and effect to controlled substances and that the many different shapes, sizes and colors of Midwest drugs are non-functional. The president of Gemini Pharmaceuticals, Midwest's supplier, testified that Midwest supplied black capsules, often used for controlled substances, to Gemini when Gemini was unable to secure an adequate supply to fill Midwest's order for drugs in black capsules.
 
 
 14
 Midwest made two primary arguments at trial: (1) Midwest was not responsible for any "passing off" by persons further down the distribution chain, and (2) its drug products were not illegal and Midwest had a legitimate market for its drug products. Midwest introduced evidence that its products were sold in retail stores and were purchased by individuals such as truck drivers and students, who wish to stay awake.
 
 
 15
 The district court held that the Midwest drugs, which had been seized in April 1984, were imitations of other drugs and enjoined Midwest from selling or marketing any drug similar in appearance and in effect to those seized. Articles II, 633 F.Supp. at 329. This appeal followed.
 
 
 16
 DEFINITION OF "IMITATION" (21 U.S.C. Sec. 352(i)(2))
 
 
 17
 Initially, Midwest argues that the failure to define the term "imitation" in the statute, legislative history, regulation, or prior case law renders 21 U.S.C. Sec. 352(i)(2) unconstitutionally vague. According to Midwest, the term "imitation" fails to give fair notice as to the behavior which is prohibited and fails to provide any explicit standards for officials enforcing the law. Midwest further asserts that a reasonable person, reading the imitation drug provision of 21 U.S.C. Sec. 352(i)(2), would not be put on notice that the section prohibited Midwest's conduct.
 
 
 18
 The government responds that Sec. 352(i)(2) is not constitutionally vague although neither the statute, regulations nor legislative history define the term "imitation." The government argues that Congress did not intend to give an esoteric meaning to the term "imitation" but defined it in terms of ordinary English speech. See 62 Cases, More or Less, Each Containing Six Jars of Jam v. United States, 340 U.S. 593, 599, 71 S.Ct. 515, 519, 95 L.Ed. 566 (1951) (62 Cases of Jam ). The government also relies on United States v. 651 Cases, More or Less of Chocolate Chil-Zert, 114 F.Supp. 430 (N.D.N.Y.1953) (Chil-Zert ), wherein the district court held that an all-inclusive test of imitation could not be fashioned. Id. at 431. The government asserts that the district court in the present case properly compared the seized drug products with the controlled substances as to color, resemblance, effect, method of manufacturing, packaging, texture, and the melting quality of the "incense."
 
 
 19
 The void for vagueness doctrine is based on the due process clauses of the Fifth and Fourteenth Amendments. D.C. & M.S. v. City of St. Louis, 795 F.2d 652 (8th Cir.1986).
 
 
 20
 'It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, ... laws [must] give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he [or she] may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, ... laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to [police], judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.'
 
 
 21
 Id. at 653, citing Grayned v. City of Rockford, 408 U.S. 104, 108-09, 92 S.Ct. 2294, 2298-99, 33 L.Ed.2d 222 (1972) (footnotes omitted).
 
 
 22
 The degree of vagueness tolerated in a law depends in part on the nature of the law. If criminal penalties may be imposed for violation of the law, a stricter standard is applied in reviewing the statute. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498-99, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982) (Hoffman ); D.C. & M.S. v. City of St. Louis, 795 F.2d at 654. Greater vagueness is permissible in a civil statute because the "consequences of imprecision are qualitatively less severe." Hoffman, 455 U.S. at 499, 102 S.Ct. at 1193. However, a law which nominally imposes only civil penalties may warrant a relatively strict test if the law is "quasi-criminal" and has a stigmatizing effect. Id.
 
 
 23
 A greater degree of vagueness is justified in economic regulations imposing civil penalties because the subject matter of the regulation is usually more narrowly defined and because businesses can be expected to consult the relevant legislation in advance of taking action. Hoffman, 455 U.S. at 498, 102 S.Ct. at 1193; Chalmers v. City of Los Angeles, 762 F.2d 753, 756 (9th Cir.1985) (Chalmers ). The " 'regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process.' " Chalmers at 757, citing Hoffman, 455 U.S. at 498, 102 S.Ct. at 1193.
 
 
 24
 We have found no cases deciding whether the term "imitation" in Sec. 352(i)(2) is impermissibly vague. The Supreme Court in 62 Cases of Jam, 340 U.S. at 599, 71 S.Ct. at 519, interpreted an identical term in 21 U.S.C. Sec. 343(c), which provides that a food shall be deemed to be misbranded if it is an imitation of another food. The Supreme Court stated that Congress did not intend to give an esoteric meaning to the term "imitation." Id. It must be noted that the Court, in making the above comments, was not considering a vagueness challenge to the term "imitation"; the FDA had issued regulations establishing standards for jam. Thus, 62 Cases of Jam is helpful but not dispositive of the vagueness issue in the present case.
 
 
 25
 The district court in Chil-Zert attempted to define the term "imitation," but as applied to food products. The district court, relying on 62 Cases of Jam, concluded that "no all-inclusive test of imitation can be prescribed.... It would seem that imitation is tested not by the presence or absence of any one element of similarity, but rather by the effect of a composite of all such elements." Chil-Zert, 114 F.Supp. at 432. Nonetheless, the district court held that the following elements should be considered in determining whether a product is an imitation: method of manufacturing, packaging and sale, taste, smell, appearance, color, texture, body, melting qualities, and identical uses. Id. The Chil-Zert court rejected the argument that a food product could not be imitated within the meaning of the statute if the FDA had not defined standards for the food product. Id. at 433. "If Congress had intended to so limit the law, it is reasonable to conclude that it would have so stated." Id.
 
 
 26
 Both 62 Cases of Jam and Chil-Zert emphasize that the term "imitation" is to be given its ordinary English meaning. "Imitation" is a frequently used word and is understood to mean "resembling something else that is genuine and of better quality: not real." Webster's Third New Collegiate Dictionary, 601 (9th ed. 1983). Resemblance alone is not enough to constitute imitation, National Pork Producers Council v. Bergland, 484 F.Supp. 540, 551 (S.D.Iowa 1980); imitation also " 'connotes inferiority ... in the sense that [the product] is cheapened by the substitution of ingredients.' " Id., quoting Chil-Zert, 114 F.Supp. at 432.
 
 
 27
 Considering the ordinary meaning of "imitation" in the context of 21 U.S.C. Sec. 352(i)(2), we conclude that the statutory term "imitation" is not impermissibly vague. A person of reasonable intelligence would understand that he or she is prohibited from distributing in interstate commerce any drug product that (1) resembles a second drug, and (2) is inferior in some sense to the second drug product, e.g., the "imitation" drug product does not contain the ingredients or pharmacological properties of the "real" drug product. We hold that the district court did not err in concluding that 21 U.S.C. Sec. 352(i)(2) was not unconstitutional because so vague as to violate due process.
 
 
 28
 Midwest next challenges the definition of "imitation" which the district court used. Midwest contends that the government and the district court relied on several different definitions of "imitation" and did not consistently apply one definition or test for imitation drug products, but rather shifted from one definition to another as necessary to find that all the seized products were imitations of other drugs. Midwest also argues that certain definitions used by the district court, such as "similar in gross appearance" and "similar in concept," are vague, require a subjective application to the facts, and exceed the scope of 21 U.S.C. Sec. 352(i)(2).
 
 
 29
 The district court, relying on Chil-Zert, held that Midwest's drugs were imitations of other drugs if they were (1) identical in shape, size and color, (2) similar or virtually identical in gross appearance, (3) similar in effect to controlled substances, or (4) similar in concept. Articles II, 633 F.Supp. at 320-23. "Similar in concept" was not specifically defined by the district court. The district court found a drug to be similar in concept to another drug if it was associated with other imitation drugs and marketed in such a way as to suggest that it was an illegal drug. Id. at 320. The district court also found a drug product to be an imitation if the drug met any of the above tests when compared either to controlled substances or when compared to Midwest drug products that were seized as illegal new drugs in November 1983. Id. (Illegal new drugs are those which have not been approved by the FDA.)
 
 
 30
 We conclude that one part of the definition of "imitation" used by the district court is broader than that used in ordinary English language. Although it is not possible to develop a test which precisely prescribes which elements of similarity must be found before an imitation exists, clearly the imitation product must be identical or similar in general appearance, color, texture, smell, or other physical properties to the "real product." Thus, we hold that the district court erred in defining "imitation" to include products which are "similar in concept" only, and in finding that Midwest's drug products that were "similar in concept" only are "imitations" in violation of 21 U.S.C. Sec. 352(i)(2). On remand, the district court must reexamine those drug products which it determined to be "similar in concept" to determine if they are "imitations" within 21 U.S.C. Sec. 352(i)(2).
 
 
 31
 In a related argument, Midwest also contends that the district court clearly erred in finding that certain Midwest drugs were imitations because they were similar in gross appearance, size, shape, and color to illegal drugs. These findings are factual findings which are reviewed under the clearly erroneous standard. Although this court may have reached a different decision concerning some of the drugs, had the decision been before our court in the first instance, we cannot say that the district court clearly erred in determining that certain Midwest drug products were similar in gross appearance, size, shape and color to other drug products.
 
 STANDARD FOR DETERMINING LIABILITY
 
 32
 Midwest next contends that the district court erred in applying a "reason to anticipate" standard in determining Midwest's liability for the passing off of its products as controlled substances and in determining whether to enjoin Midwest from selling its drug products. Midwest argues that the Supreme Court in Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982), expressly rejected the "reason to anticipate" test as a basis for holding a manufacturer or a distributor liable. The proper test, according to Midwest, is whether the manufacturer or distributor continues to supply its products to a person who the manufacturer or distributor knows or has reason to know is engaged in unlawful activity.
 
 
 33
 We consider first Midwest's argument that the district court applied the wrong test in determining whether the drugs were imitations. Section 331 imposes strict liability for misbranding, which includes distribution of imitation drugs. In order to condemn drugs under 21 U.S.C. Sec. 331, a district court must find that (1) the drug is an imitation drug, and (2) the drug moved in interstate commerce. The government need not prove knowledge or awareness that the drugs are misbranded or an intent to deceive or defraud. United States v. Guardian Chemical Corp., 410 F.2d 157, 162 (2d Cir.1969); United States v. Torigian Laboratories, Inc., 577 F.Supp. 1514, 1526 (E.D.N.Y.1984) (criminal liability in food and drug cases attaches without any proof of intent, knowledge, or awareness of wrongdoing); United States v. 48 Jars, More or Less, of an Article of Drug Labeled Tranquilease, 23 F.R.D. 192 (D.D.C.1958).
 
 
 34
 We have already concluded that the district court in this case properly found that the Midwest drug products (except for a few of the drugs previously noted) were imitation drugs. Midwest does not dispute that its drugs moved in interstate commerce. Thus, even if the district court applied a "reason to anticipate" test to determine whether the drugs were imitation, hence subject to condemnation, there would be no error. In effect, the district court required the government to prove more than it was required to prove under 21 U.S.C. Sec. 331.
 
 
 35
 We next consider Midwest's argument that the "reason to anticipate" test was an improper one to use to determine if injunctive relief was appropriate. In its December 9, 1984, order denying the government's motion for a temporary restraining order, the district court stated that the government must show that "defendants intentionally induced another to commit a violation of 21 U.S.C. Sec. 352(i)(2), or that they knew, had reason to know or reasonably could have anticipated that a substantial portion of their products would be passed off as controlled substances by others in the chain of distribution." In a later order, dated December 11, 1984, the district court used almost identical language in denying Midwest's motion for partial summary judgment and the government's motion for summary judgment on Midwest's counterclaim. The district court stated:
 
 
 36
 [M]anufacturers and distributors may be held contributorily liable for the alleged violations of 21 U.S.C. Sec. 352(i)(2) if they intentionally induced another to commit any such violation, or if they knew, had reason to know or reasonably could have anticipated that a substantial portion of their products would be passed off as controlled substances by others in the chain of distribution.
 
 
 37
 Articles I, 601 F.Supp. at 394.
 
 
 38
 Midwest challenges only the "reason to anticipate" portion of the test articulated by the district court. It does not argue that an injunction could not issue if the district court found that Midwest had intentionally induced others to violate 21 U.S.C. Sec. 352(i)(2). Because we hold that the district court found that Midwest intentionally induced others to violate 21 U.S.C. Secs. 331(b), 352(i)(2), we need not decide whether the district court could have properly enjoined Midwest if Midwest only had a "reason to anticipate" that its drug products were being passed off as controlled substances.
 
 
 39
 Although the district court did not state in one summary finding that Midwest intentionally induced others to violate 21 U.S.C. Secs. 331(b), 352(i)(2), nonetheless, the opinion read as a whole clearly reflects that the district court found that Midwest intended to pass off its drug products as controlled substances. Articles II, 633 F.Supp. at 325-26. The district court found that in 1980 Sommers and Liebert encouraged Ken Maschmeier, a Midwest customer, to sell Midwest products to others by passing them off as controlled substances. Daniel Bengtson and Robert Bryan, also Midwest customers, testified that they told Sommers and Liebert that they were selling Midwest products as controlled substances. The district court specifically found that Sommers knew of the practice of passing off, endorsed and encouraged the practice and on some occasions personally sold Midwest drug products as controlled substances. Id. The district court also found that several practices of Midwest evidenced an intent to pass off its drug products as controlled substances: (1) inert brown beads similar in appearance to those used in amphetamine capsules were placed in Midwest capsules, (2) Midwest marketed yellow capsules with the markings "RUS," "RJS," and "RUA," markings that are deceptively similar to markings on amphetamine capsules manufactured by the R.J. Strasenburgh Co., and (3) Midwest marketed tablets bearing the imprints "ROR" and "714," markings that are deceptively similar to the imprints on controlled substances imprinted "RORER" and "714," commonly called quaaludes. Id. We hold that the district court did not clearly err in finding that Midwest intentionally induced others to violate 21 U.S.C. Secs. 331(b), 352(i)(2).
 
 
 40
 Midwest contends next that the government failed to prove that a substantial amount of each of the seized drug products had been passed off. Midwest contends that in an in rem seizure action, each of the articles of drugs is a defendant and the government must prove by a preponderance of the evidence that a substantial portion of each has been passed off. Midwest contends that the government introduced no evidence that a substantial portion of each drug was passed off.
 
 
 41
 Because we have determined that the district court correctly found that Midwest intentionally induced others to violate 21 U.S.C. Secs. 331(b), 352(i)(2), we need not consider whether the district court clearly erred in finding that a substantial portion of Midwest drugs had been passed off. We note, however, that Bengston and Maschmeier testified that they distributed two million pills as controlled substances.
 
 INJUNCTION
 
 42
 Midwest next contends that the permanent injunction issued by the district court is both defective and grossly overbroad. Midwest argues that the injunction violates Fed.R.Civ.P. 65(d) because it fails to enumerate the drug products Midwest is enjoined from marketing. In addition, Midwest argues that the injunction is overbroad because it prohibits the sale of Midwest products for legal uses.
 
 
 43
 We consider first Midwest's contention that the injunction violates Fed.R.Civ.P. 65(d) which provides: "Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." We agree that the injunction violates Rule 65(d). The district court order enjoins Midwest from
 
 
 44
 selling or marketing in any way products described in CV. 84-0-206 and further are enjoined from employing marketing techniques to sell drug products identical or similar to those described in CV. 84-0-206, which techniques include one or a combination of practices of providing a certain dosage in numerous forms or advertising solely on the basis of appearance of the product.
 
 
 45
 United States v. Articles of Drugs, CVB4-0-323, slip op. at 1-2 (D.Neb. Apr. 2, 1986). The injunction fails to identify the specific drug products that Midwest is prohibited from selling or marketing and fails to specify the marketing techniques that Midwest may not employ. On remand the district court should revise the injunction so that the specific acts which are prohibited are clearly defined within the order as required by Fed.R.Civ.P. 65(d).
 
 
 46
 Midwest also argues that the injunction is overbroad because it is not tailored to remedy the alleged specific harm, that is, the passing off of Midwest drug products as controlled substances. Midwest argues that there is no legal basis to enjoin the otherwise lawful sale of drug products that are capable of a lawful use to customers who act lawfully in reselling or consuming these products.
 
 
 47
 The government responds that the injunction is not overbroad because the injunction, as drafted, is necessary in order to prevent Midwest from continuing its illegal conduct. According to the government, a narrower injunction would not be effective because, even without future advertising, Midwest could continue to sell these drug products as a result of residual orders and repeat business. Thus, Midwest would reap future profits from its past illegal conduct.
 
 
 48
 Under Sec. 332, the district court is authorized to restrain acts that are in violation of 21 U.S.C. Sec. 331. Good faith is not a defense to the issuance of an injunction. United States v. Hoxsey Cancer Clinic, 94 F.Supp. 464 (N.D.Tex.1950), rev'd on other grounds, 198 F.2d 273 (5th Cir.1952), cert. denied, 344 U.S. 928, 73 S.Ct. 496, 97 L.Ed. 714 (1953). Nor may a defendant successfully defend against the issuance of an injunction by asserting that the injunction would drive it out of business. United States v. Diapulse Corp., 457 F.2d 25, 28 (2d Cir.1972). A district court may issue an injunction if it concludes that the injunction is necessary to prevent future violations. United States v. Sars of Louisiana, Inc., 324 F.Supp. 307 (E.D.La.1971). In United States v. Vitasafe Corp., 345 F.2d 864, 870 (3d Cir.), cert. denied, 382 U.S. 918, 86 S.Ct. 290, 15 L.Ed.2d 232 (1965), an injunction was upheld because the district court reasonably concluded that sales of illegal vitamin tablets would continue as a result of the prior misbranding of the tablets. See United States v. An Article of Drug, 661 F.2d 742, 747 (9th Cir.1981) (an injunction may be framed to bar future violations that are likely to occur).
 
 
 49
 The government presented evidence that Midwest had a pattern of noncompliance with federal drug laws. For example, the government showed that Midwest continued to sell imitation drug products, without change, after the FDA advised Midwest in regulatory letters that Midwest drug products were being passed off and after several seizures of Midwest products by the FDA. The district court could reasonably conclude that Midwest would continue the illegal acts unless restrained. We hold that the district court did not abuse its discretion in issuing an injunction barring Midwest from marketing and selling drugs in violation of 21 U.S.C. Secs. 331, 352(i)(2).
 
 DISMISSAL OF MIDWEST'S COUNTERCLAIMS
 
 50
 Midwest next contends that the district court erred in dismissing its counterclaim against the government for negligent pre-seizure investigation. Midwest asserts that the government first wrongfully seized its drug products and then later investigated whether the seizure was justified.
 
 
 51
 The government argues that the district court correctly dismissed the counterclaim because Midwest's claim is barred by the discretionary function exception of the FTCA. The government argues that a decision whether to prosecute a seizure and forfeiture under federal law is a policy level decision and comes within this exception. In addition, the government argues that the counterclaim was barred by another section of the FTCA that prohibits tort claims based upon damages arising in a seizure matter.
 
 
 52
 We hold that the district court properly granted summary judgment in favor of the government because Midwest's counterclaim is barred by the discretionary function exception. In United States v. S.A. Empresa de Viacao Aerea Rio Grandense, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), the Supreme Court emphasized that it is the nature and quality of the government employee's act, not his or her status, that is important in applying the discretionary function exception. According to the Court, Congress intended to protect "the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals.... Congress wished to prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic and political policy through the medium of an action in tort." Id. at 813-14, 104 S.Ct. at 2764-65 (footnotes omitted). See McMichael v. United States, 751 F.2d 303 (8th Cir.1985). The decision whether to prosecute a seizure and forfeiture is not, as asserted by Midwest, a routine day-to-day operational duty, but rather requires an exercise of judgment and a consideration of policy.
 
 PRETRIAL AND TRIAL RULINGS
 
 53
 Midwest lastly argues that the district court committed reversible error in both admitting and excluding certain evidence. Midwest attacks the admitted evidence as irrelevant, hearsay, as not based on personal knowledge, and as speculative. Midwest asserts that the district court wrongfully excluded the testimony of several Midwest customers who would have testified to the legal purchase and use of Midwest products. We have carefully reviewed Midwest's allegations of evidentiary error and conclude that they are meritless.
 
 
 54
 Accordingly, the judgment of the district court is affirmed in part, reversed in part, and this case is remanded to the district court for further proceedings consistent with this opinion.
 
 
 
 [1]
 21 U.S.C. Sec. 331(b) provides: "The following acts and the causing thereof are prohibited: ... (b) The adulteration or misbranding of any food, drug, device, or cosmetic in interstate commerce." 21 U.S.C. Sec. 352(i)(2) defines "misbranded": "A drug or device shall be deemed to be misbranded ... (i)(2) if it is an imitation of another...."
 21 U.S.C. Sec. 334(a)(1) provides that imitation drugs may be seized:
 Any article of food, drug, device, or cosmetic that is adulterated or misbranded when introduced into or while in interstate commerce or while held for sale ... shall be liable to be proceeded against while in interstate commerce, or at any time thereafter, on libel of information and condemned in any district court....
 
 
 [2]
 21 U.S.C. Sec. 332(a) provides: "The district courts ... shall have jurisdiction, for cause shown, ... to restrain violations of section 331 of this title...."
 
 
 [3]
 Midwest was located in Iowa from 1980 to 1982. In 1982, Iowa passed an Imitation Controlled Substance Act; in the same year, Midwest moved to Omaha, Nebraska. In 1985, Nebraska passed an Imitation Controlled Substance Act; in the same year, Midwest relocated to Council Bluffs, Iowa
 
 
 [4]
 The government presented evidence that 92 percent of Midwest's products were sold in 1,000 dosage units. Midwest contends that most of its products are sold in 100 and 250 dosage units