Robert S. Leibert.

No. 88–2535.

United States Court of Appeals, Eighth Circuit.

Submitted June 14, 1989.

Decided Nov. 27, 1989.

UNITED STATES of America, Appellee,

v.

ARTICLES OF DRUG CONSISTING OF UNDETERMINED QUANTITIES OF DRUGS CONTAINING CAFFEINE, EPHEDRINE, EPHEDRINE SULFATE, PHENYLPROPANOLAMINE

John M. O'Connor, New York City, for appellant.

Robert M. Spiller, Jr., Rockville, Md., for appellee.

Before JOHN R. GIBSON and WOLLMAN, Circuit Judges, and BROWN,* Senior Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

Midwest Pharmaceuticals, Inc., appeals from a district court order permanently enjoining Midwest from selling, advertising, or marketing specified "look-alike" drug products. In an earlier appeal of this case, we remanded to the district court [1] to revise its injunction to identify the specific drug products which Midwest is prohibited from selling or marketing, and the specific marketing techniques which Midwest may not employ. Midwest now argues that the injunction, as modified on remand, is overly broad because it is prevented from employing different marketing techniques, not found objectionable by the district court, to sell otherwise legal products. It argues that the injunction should be further revised to prohibit Midwest only from marketing the identified products or substantially similar products by the means found objectionable. We are satisfied that the injunction is carefully tailored to prohibit only those transactions which would either violate the law or allow Midwest to profit from earlier violations of the law. Accordingly, we affirm the judgment of the district court.

I.

This case involves an action brought by the Food and Drug Administration against Midwest arising out of its marketing and distribution of certain drug products which were alleged to be "misbranded" under federal law. The FDA objected to the marketing and distribution of these drugs, known alternatively as "look-alike drugs" or "imitation drugs," because their similarity to controlled substances made them susceptible to being "passed off" to the ultimate consumer as controlled substances. Federal law prohibits the misbranding of any drug in interstate commerce. 21 U.S.C. § 331(b) (1982). A drug is considered misbranded under federal law if it is an imitation of another drug. 21 U.S.C. § 352(i)(2) (1982). Under 21 U.S.C. § 332(a) (1982), district courts are authorized to enjoin the misbranding of drugs in interstate commerce, and such drugs are subject to seizure under 21 U.S.C. § 334 (1982).

In April 1984, law enforcement officials from the FDA seized drug products from Midwest on the ground that the drugs were imitations of other drugs by virtue of their physical appearance, physiological effects, and the manner in which they were advertised, marketed, distributed, and sold. The FDA sought to permanently enjoin Midwest from marketing these drug products. The district court found that the seized products were marketed as imitations of other drugs and were designed to be "passed off" as controlled substances. *United States v. Articles of Drug*, 633 F.Supp. 316, 324 (D.Neb.1986). Accordingly, the court found injunctive relief appro-

---

* The HONORABLE JOHN R. BROWN, Senior Circuit Judge for the United States Court of Appeals for the Fifth Circuit, sitting by designation.

1. The Honorable Lyle E. Strom, United States District Judge for the District of Nebraska.

priate to restrain Midwest from further violations of the law, and enjoined Midwest from selling or marketing these imitation drugs. The injunction considered a drug to be an "imitation" of another drug if it met one of the following tests: (1) identical in shape, size, and color; (2) similar or virtually identical in gross appearance; (3) similar in effect to controlled substances; or (4) similar in concept.

Midwest appealed the injunction to this court, which held that the injunction failed to identify either the specific drug products which Midwest was prohibited from selling or marketing, or the marketing techniques which Midwest could not employ. *United States v. Articles of Drug*, 825 F.2d 1238, 1247 (8th Cir.1987). The district court was instructed upon remand to revise the injunction to clearly define the specific acts which were prohibited. *Id.* Referring to the injunction's four-part test for determining whether a drug was an "imitation," this court held that it was error to define "imitation" to include products which were "similar in concept" only. *Id.* We instructed the district court to review the products found to be "similar in concept" to determine whether they were "imitations" in light of the remaining three definitions. *Id.*

Upon remand, the district court made specific findings regarding the one drug which it had earlier found to be an "imitation" only because it was "similar in concept" to other drugs. It found that this drug was also identical in shape, size, color, and was similar in effect to an illegal drug and therefore affirmed its earlier conclu-

sion that Midwest should be enjoined from marketing it.

The district court then specifically enumerated eight categories of drugs found to be imitations and thus subject to condemnation and injunction. The court emphasized that the drugs were misbranded on the basis of their resemblance to illegal drugs and the manner in which they were marketed, enabling them to be "passed off" as imitations of controlled substances. Accordingly, the order permanently enjoined Midwest from selling, advertising, or marketing the drugs in the enumerated categories.

In addition to the specific categories of drugs, the injunction challenged in this appeal also applied to: (1) drugs identical or substantially identical in appearance to those condemned as imitations; (2) drugs identical or substantially identical in shape, size, and color, or in gross appearance to controlled substances; and (3) drugs marketed by using allegations or implications that they are similar to controlled substances, using promotions that provide pictures or descriptions of the color of the drugs, and failing to provide the identity and quantity of the pharmacological ingredients. Midwest was further enjoined from distributing more than 5,000 dosage units to any individual buyer unless the buyer provided the name under which he did business, and certified both that he was regularly and lawfully engaged in the drug distribution business and that he understood that repackaging without relabeling would make the drug misbranded.[2]

---

2. The order challenged by Midwest in this appeal, in part, enjoins:

    (b) Any drugs identical or substantially identical in appearance to those condemned as imitations in this case and listed above;

    (c) Any drugs identical or substantially identical in shape, size and color or in gross appearance to controlled substances;

    (d) Any drugs marketed using allegations or implications that they are similar to any controlled substance (e.g., "fools the experts"), or using advertisements or promotions that provide pictures or graphical depictions of the drugs or descriptions of the color of the drugs and fail to provide the identity and quantity of the pharmacological ingredients, and the

indications and any appropriate contraindications of the drug;

    (e) More than 5,000 dosage units within a twelve-month period of any drug or combinations or assortment of drugs to any individual buyer (whether in one transaction or a sequence of transactions) unless the buyer certifies in writing that he/she is regularly and lawfully engaged in the drug distribution business, that he/she understands that the repackaging of drugs without legally required labeling makes the drug misbranded, and provides the full business name, address and telephone number under which the buyer operates and does business.

*United States v. Articles of Drug*, 601 F.Supp. 392 (D.Neb.1988) (order granting injunction).

## II.

The sole argument raised by Midwest in this appeal is that the injunction, as revised by the district court after the earlier appeal, is overly broad because it prohibits Midwest from marketing legal drugs through otherwise permissible marketing techniques. Midwest argues that the evidence before the district court established that many of the drug products sold by Midwest were not similar in gross appearance to any controlled substance and therefore could be sold without violating the law if it were permitted to use unobjectionable marketing techniques. Midwest contends that because the district court's finding of misbranding was based on the sale of these products *in combination with* Midwest's marketing techniques, it should be permitted to distribute these products using other marketing techniques. It points out that the injunction prohibits Midwest from selling lawful products in exactly the same way that a brand-name distributor, such as Thompson Medical Company, markets products such as Caffedrine and Dexatrim. Midwest relies on *United States v. Vitasafe Corp.*, 345 F.2d 864 (3d Cir.), *cert. denied*, 382 U.S. 918, 86 S.Ct. 290, 15 L.Ed.2d 232 (1965), for the proposition that it is error to enjoin the sale of products earlier found to be misbranded if sold through new and proper marketing techniques.

We are not persuaded by these arguments. As our earlier opinion observed, Midwest engaged in illegal activity by intentionally inducing others to "pass off" its drug products in imitation of controlled substances. *Articles of Drug*, 825 F.2d at 1246–47. It has utilized objectionable marketing techniques to develop a market of 60,000 customers for its "look-alike" drugs. *Id.* at 1241. There was evidence that Midwest had repeatedly failed to comply with federal drug laws. *Id.* at 1248. The government urges that narrowing the scope of the injunction would be ineffective in preventing Midwest from engaging in

criminal conduct because, even if Midwest ceased its objectionable advertising, it could continue to sell its drug products as imitation drugs due to the residual effects of its earlier objectionable advertising. The government contends that "Midwest would reap future profits from its past illegal conduct," *id.*, because Midwest has significantly contributed to the development of a market for "look-alike" drugs. As a result of Midwest's marketing techniques, its customers realize that whatever looks like a controlled substance can potentially be resold to the ultimate consumer as a controlled substance, no matter what marketing techniques are employed by Midwest. We believe that injunctive relief is appropriate here. In our earlier opinion, we held that "[t]he district court could reasonably conclude that Midwest would continue the illegal acts unless restrained." *Id.*

The injunction entered by the district court was carefully tailored to address violations of the law by Midwest. Midwest had established a substantial body of customers for its "look-alike" drugs by inducing others to "pass off" its products. *Id.* at 1246. The injunction in issue sought to prevent further illegal conduct and to prevent Midwest from capitalizing on the illegal market it had developed by enumerating the categories of drugs found to be imitations, by enjoining marketing of products which can be similarly "passed off," and by prohibiting advertisement which focuses upon the look-alike character of these drugs rather than their pharmacological qualities. The injunction sought to eliminate distribution to illegitimate dealers, yet permit Midwest to engage in legitimate business activities, by requiring buyers who purchase more than 5,000 dosage units to certify that they are engaged in lawful drug distribution.

This case is easily distinguished from the case relied upon by Midwest, *United States v. Vitasafe*. In *Vitasafe*, the court held, as

---

We believe that the district court may have intended that the words "selling, advertising or marketing," which appeared in (a) immediately before the language set out above, be also included in the paragraph introductory to the subparagraphs reproduced here, and we believe that the parties to this appeal have so considered it. Upon entry of the mandate, the district court may consider clarification of this language.

Midwest urges us to hold here, that an injunction prohibiting all sales to any customer who had previously received objectionable advertising literature, even if the customer was reached through unobjectionable advertising, was overly broad. *Vitasafe,* 345 F.2d at 870–71. There is a critical distinction between the facts of *Vitasafe* and the facts of this case which necessitates a different result. In *Vitasafe,* no market for distributing drugs passed off in imitation of controlled substances existed, as it does here. Furthermore, unlike the *Vitasafe* court, we cannot be assured that a mere change in advertising techniques will ensure only legitimate use of the defendant's products. The carry-over effect of successful misbranding has long been recognized by courts. In *United States v. 3 Cartons, More or Less, "No. 26 Formula GM",* 132 F.Supp. 569 (S.D.Cal.1952), the court noted that it was not significant that the distributor had stopped disseminating misbranded literature. "Where a person has set in motion forces that result in the continued profitable demand for his products, he cannot continue to fill that demand and yet avoid all responsibility for those forces by disclaiming he is still setting them in motion." *Id.* at 574.

In reaching this result, we observe that Midwest is not totally precluded from marketing drug products. It is not prohibited from engaging in the lawful sale of drug products not subject to the district court's order. The only business opportunities denied to Midwest are the illegal business activities which necessitated this injunction. The certification requirements for sales in excess of 5,000 dosages to a single buyer were designed to promote legitimate drug distribution and yet prevent illegitimate activities.[3]

We are satisfied that the injunction was carefully tailored to prohibit Midwest from engaging in illegal transactions and from profiting from their earlier transgressions, and yet permit it to continue in legitimate distribution activity. We conclude that the injunction was not overly broad and, accordingly, we affirm the judgment of the district court.

---

**3.** For example, there was evidence presented at trial that a high school student-dealer purchased 13,000 dosage units from Midwest.